[L. A. No. 2489.  Department One.—July 19, 1910.]

## UNION OIL COMPANY, Respondent, v. NAT STEWART and E. B. MULLENARY, Appellants.

ACTION TO QUIET TITLE—INJUNCTION—EXECUTION SALE—ATTACHMENT —TITLE UNDER WIFE—DEED FROM DESERTING HUSBAND—POSSESSION—SUPPORT OF FINDINGS.—In an action to quiet title to a disputed tract and to enjoin a sale upon execution by an attaching creditor of a husband, under an attachment January 8, 1903, where the plaintiff claimed under a conveyance to the wife by a deserting husband executed in 1895, the husband having acquired the disputed property in 1891, and made it part of a ranch which he deeded to his wife, who took possession of the whole property and paid all taxes thereupon until January 28, 1903, when she conveyed it to plaintiff's grantor, it is held that the findings for the plaintiff were sustained by the evidence, showing that the deed to the wife included the disputed property, and that the wife was entitled thereto, as against the attaching creditor of the husband.

ID.—ATTACHING CREDITOR NOT A BONA FIDE PURCHASER.—An attaching creditor of the husband is not a *bona fide* purchaser for value of the disputed tract, and has no standing with respect thereto different from that the husband would have, if he were claiming the disputed land for himself.

ID.—DISPUTED BOUNDARY OF HUSBAND'S RANCH—CONFIRMATORY DEED OF DISPUTED TRACT—TAXES—CONSTRUCTION OF DEED TO WIFE.— Where the husband owned a ranch of twenty thousand acres, the boundary of which was disputed by the owners of another ranch, and in settlement of the dispute, such owners conveyed to him the disputed strip, containing 139.54 acres in 1891, which he immediately inclosed by his fences, and thereafter claimed the tract as a part of his ranch, the whole of which he deeded to his wife for the support of herself and her children, when he deserted her, in 1895, such deed, being a private grant, is to be interpreted against the grantor, and any uncertainty caused by him in the description in the deed is to be interpreted most strongly against him who caused the uncertainty to exist.

ID.—EVIDENCE CONFIRMING ORIGINAL INTENTION IN DEED—DEED CALLING FOR TRUE BOUNDARY.—Where it clearly appears that after the execution by the husband of the deed in 1895 to his wife, the husband never attempted to exercise any ownership of any part of the tract, which was included within the fences of his ranch, and that he intended to convey all of the land included in the ranch as fenced, and to give the same to his wife for the support of herself and children; and when it further appears that the call for the description of the other ranch was twelve chains east of the husband's

ranch, and his description of the boundary of the other ranch in his deed would include the whole of the disputed tract, that is to be considered as the true boundary of the land granted, notwithstanding any uncertainty in the description, which must be resolved in favor of the grant of the disputed tract.

ID.—POWER OF WIFE TO PERFECT TITLE AGAINST HUSBAND BY ADVERSE POSSESSION.—Though the wife cannot acquire adverse possession against the husband while he remains the head of the family, yet when he has left his family, has ceased to contribute to its support, and has assumed to give or abandon all of his property to the use of his wife for that purpose, there is no consideration of public policy which precludes her from perfecting her title as against the husband or any of his creditors by adverse possession of the property left in her hands, in the same manner in which she might acquire it if unmarried.

ID.—LIBERAL CONSTRUCTION OF STATUTES FAVORING MARRIED WOMEN— POWER TO HOLD ADVERSELY.—Our liberal statutes concerning the rights and powers of married women invest a married woman with sufficient power to hold adversely to her husband in the acquisition and control of her separate property.

ID.—CONSTRUCTION OF CODE—EARNINGS AND ACCUMULATIONS OF WIFE LIVING APART—SEPARATE PROPERTY—PRESCRIPTION.—Under section 169 of the Civil Code, the earnings and accumulations of the wife and of her minor children while she is living apart from her husband, are the separate property of the wife. Property acquired by her by adverse possession would, under that section, be clearly included in the term "accumulations."

ID.—GENERAL MEANING OF ACCUMULATION—CODE PROVISIONS.—When one speaks generally of accumulation of property, he is understood to refer to any property which a person acquires and retains, without regard to the means by which it is obtained. An accumulation may result from an exchange of community property, and, in such case, the accumulation would be community property. But where the wife, while living separately and apart from the husband, accumulates property by her efforts of any kind and holds control of it, it is her separate property, under section 169 of the Civil Code. With respect to such property, sections 162, 163, and 164 of the Civil Code, regarding community property acquired after marriage by either spouse, have no application.

ID.—PERMANENT DESERTION BY HUSBAND — PRESCRIPTIVE TITLE OF WIFE—SEPARATE ESTATE.—When a husband abandons and deserts his wife, remaining permanently separate from her, and delivers to her the possession of his property, she may claim title to it as her separate estate, and acquire the legal title in fee by adverse possession against him.

ID.—IMPROPER OPINION EVIDENCE NOT PREJUDICIAL—PROOF OF FACT.— The opinion evidence of a witness that the land in dispute was considered and treated by the husband and wife as belonging to his

ranch, was improperly admitted, but its admission was not preju-
dicial where the undisputed evidence shows that said land was
inclosed by his fences, and so remained during his possession, and
afterwards, continuously during the possession by his wife, after
his deed to her, and after her subsequent deed to plaintiff's grantor.

ID.—PROOF OF DELIVERY OF DEED TO WIFE—LETTER TO FATHER OF WIFE
INCLOSING DEED—DECLARATION OF DESERTION.—A letter of the
husband to the father of the wife inclosing the deed to him for
delivery to her, was admissible in connection with proof of such
delivery to her, and also as proof of his declaration therein that he
intended permanently to desert her.

APPEAL from an order of the Superior Court of Santa
Barbara County denying a new trial.  S. E. Crow, Judge.

The facts are stated in the opinion of the court.

B. F. Thomas, for Appellants.

C. A. Storke, and E. W. Squier, for Respondent.

SHAW, J.—This is an appeal from an order denying
defendants' motion for a new trial.

Plaintiff's action is to quiet its alleged title to certain land
and to enjoin defendant Stewart from selling said land on an
execution issued to him, as sheriff of Santa Barbara County,
upon a judgment in favor of the defendant Mullenary, against
one J. Ben Burton.  The suit of *Mullenary* v. *Burton* was
begun January 8, 1903, and on that day an attachment therein
was issued and levied on the land in dispute.  Judgment was
recovered from Burton for $2710.63, and it became final on
June 14, 1906.  (*Mullenary* v. *Burton,* 3 Cal. App. 263, [84
Pac. 159].)  The defendant's claim is that the land was, at the
time he levied the attachment, the property of J. Ben Burton,
or at least subject to execution for his debts.  The plaintiff
claims title to the land by mesne conveyances from Stella F.
Burton, her conveyance being subsequent to the levy of the
attachment.  The sole question presented in the case is
whether at the date of the levy the land was the property of
J. Ben Burton, or the property of Stella F. Burton.

J. Ben Burton was the owner of the land on February 7,
1895.  He was then and still is the husband of Stella F. Bur-
ton.  On that day, as the court found, he deserted and aban-

doned her and left the state of California, and he has ever since that time lived separate and apart from her and outside of this state. On that day he executed to her a deed of conveyance, the effect of which to convey the land in dispute is one of the main questions in the case. The court finds that the descriptive clause in this deed included the land in controversy. Immediately after its execution Stella F. Burton entered into possession of the entire tract described therein, including the land in controversy, claiming title thereto under the deed, and the court finds that from that time continuously until January 28, 1903, she occupied and possessed the same openly, notoriously, exclusively, adversely to all others, under a claim of right and title thereto, cultivating the same in the usual manner and paying all taxes thereon. On January 28, 1903, she conveyed it to one Rudisell who, upon March 13, 1903, conveyed it to the plaintiff, and plaintiff has ever since held possession thereof in the same manner above described.

Two principal points upon which the defendant urges reversal are that the finding that the deed of 1895 included the tract of 139.54 acres, which comprises the land in dispute, is contrary to the law and the evidence, and that under the law, Stella F. Burton could not acquire title to her husband's land by adverse possession against him while the marriage relation continued to exist. There is some contention that the finding of the court with relation to the facts constituting adverse possession is not supported by the evidence. We do not think it necessary to discuss the evidence upon the point. It is sufficient to say that there is ample evidence to support the finding on that subject.

The court correctly held that the deed to Stella F. Burton included this land. The defendant Mullenary, is a mere attaching creditor of J. Ben Burton. He has no standing, with respect to this question, different from that which J. Ben Burton would have if he were claiming the land for himself. He is not a *bona fide* purchaser for value. Burton became the owner of the 139.54 acres in 1891. At that time he was the owner of a large tract of land which the evidence indicates contained exactly twenty thousand acres, situated in what is called the central part of the Rancho Jesus Maria. This rancho according to the United States patent therefor, contained 42,179 acres of land bordering on the Pacific Ocean.

The twenty thousand acres belonging to Burton extended from the ocean easterly through the rancho to its easterly boundary. Another large rancho designated as La Purisima adjoined it on the east. A dispute arose concerning the boundaries between the lands of Burton and the owners of La Purisima. In settlement thereof the owners of La Purisima on November 17, 1891, executed a deed to J. Ben Burton purporting to convey to him a strip of land containing 139.54 acres, twelve chains in width, east and west, and one hundred and sixteen chains in length, north and south, lying along the eastern patent boundary of the Jesus Maria Rancho. The boundaries of this tract, as described in the deed, indicate that it lay entirely within the Rancho La Purisima. It constitutes the land in controversy. Immediately after acquiring it Burton extended his fences so as to include it in the same inclosure as the twenty-thousand-acre tract, and thereafter it was occupied and used by him in connection with his twenty thousand acres and as a part of the same ranch or farm. The land in La Purisima Rancho adjoining this strip on the east belonged to John H. Wise and Thomas Denigan at the time Burton acquired the strip, and it is referred to in the evidence as the land of Wise.

On February 7, 1895, Burton, being at San Jose, California, drew up and signed the deed to his wife, inclosed it in an envelope and mailed it to George Tebbetts, his wife's father, who was then at Santa Barbara, accompanying it with a letter to Tebbetts stating that he had left his wife and family for all time and directing him to deliver the deed to her. She was at that time residing in San Francisco. This deed describes the land intended to be conveyed as follows: "All that certain lot, piece, or parcel of land, . . . bounded and described as follows, to wit: The central portion of the Rancho Jesus Maria containing about twenty thousand acres, bounded on the north by the land owned by H. Dutard, on the east by the Rancho of La Purisima owned by John H. Wise, on the south by land owned by A. Packard, on the west by the Pacific Ocean, (for more particular description see patent on record in city of Santa Barbara, California.)" On February 21, 1903, after the levy of the Mullenary attachment, Burton executed to her a deed purporting to convey the 139.54 acre tract, declaring therein that it was a part of the premises

which he intended to convey to her by the deed of February 27, 1895, and that this later deed was executed to render more certain the description of the premises intended to be conveyed by the deed of 1895.

A grant of this character is to be interpreted against the grantor. (Civ. Code, sec. 1069.) In other respects grants are to be interpreted in like manner with other contracts. (Civ. Code, sec. 1066.) In cases of uncertainty in a contract, it is to be interpreted most strongly against the party who causes the uncertainty to exist. (Civ. Code, sec. 1654.) It was Burton himself who caused the existence of such uncertainty as appears in the description in the deed of 1895. It clearly appears from the evidence that after the execution of that deed he never attempted to exercise any ownership over any part of the land and that he intended to give it all to his wife for the support of herself and her children. The deed states that the land conveyed is "the central portion of the Rancho Jesus Maria containing about twenty thousand acres," and that it is bounded "on the east by the Rancho of La Purisima owned by John H. Wise." If the phrase "owned by John H. Wise" had been omitted it would have been clear that the land actually conveyed included only the land within the proper patent boundaries of the Rancho Jesus Maria and that no land included in the Rancho La Purisima could have been considered as passing by the conveyance. But Wise did not own that part of the Rancho La Purisima adjoining the Rancho Jesus Maria. His land lay twelve chains easterly of that line. The effect of the descriptive words was to carry the boundary beyond the ranch line to the land which, by reason of the fact that it was owned by Wise, would answer the whole of the description above given. It might be urged perhaps that the language of the description leaves some uncertainty whether the eastern boundary line was intended to be the surveyed line of the rancho or the boundary of the land owned by Wise. But by reason of the rules above stated this uncertainty is to be resolved against the grantor in favor of the grantee, and the last phrase must be considered as the controlling part of the description. The result is that the deed conveys all of the lands owned by Burton at the time extending easterly to the lands owned by Wise, and, therefore, that it includes the land in controversy. The situation of the respective tracts at that

time and all the attending circumstances, as well as the subsequent conduct of the parties with regard to its possession, all lead to this conclusion as the only reasonable theory.

We see no sufficient reason for the determination that a wife cannot, under any circumstances, acquire title to her husband's land by continuous exclusive possession adversely to him. It may be conceded that she could not do so while they were living together and he remained the head of the family. This has in effect been decided by this court in *Frink* v. *Alsip*, 49 Cal. 103; *First N. Bank* v. *Guerra*, 61 Cal. 113, and *Mauldin* v. *Cox*, 67 Cal. 390, [7 Pac. 804]. But the language of these decisions is carefully qualified by the phrases we have stated above. In *Bank* v. *Guerra* the court says: "She could not claim adversely to him, or to those claiming under him, so long as he remained the head of the family." In *Mauldin* v. *Cox*, it is said: "We conclude that during coverture, while the husband remains the head of the family, neither party to the marital relation can hold the homestead adversely to the other." This qualified language shows an intent to distinguish those cases from one where the husband has deserted his family and no longer remains at its head. But when he has left his family, has ceased to contribute to its support, and has abandoned his property to the use of his wife for that purpose, there is no consideration of public policy which prevents her from exercising the same powers and acquiring the same rights with respect to the property left in her hands as if she were an unmarried person. Our liberal statutes concerning the rights and powers of married women invest her with sufficient power to hold adversely to her husband. She may own, hold, and control her separate property, as fully and completely as the husband can own and control his separate property. (Civ. Code, sec. 162.) Neither spouse has any interest in the separate property of the other. (Civ. Code, sec. 157.) Either may sue the other to recover possession of his or her separate property. (Code Civ. Proc., sec. 370; *Wilson* v. *Wilson*, 36 Cal. 453, [95 Am. Dec. 194].) It is true that neither spouse can be excluded from the other's dwelling. (Civil Code, sec. 157.) Perhaps there could not be adverse possession in law, of the dwelling, although doubtless there could be, in fact, an exclusive hostile holding thereof by one spouse. The point is not involved here for the wife did

not dwell on any part of the land in dispute or on the other part of the rancho, during the time of the adverse holding. She resided in San Francisco in 1895 and thereafter so long as she continued to own the land. It was occupied by a tenant or managing agent and she only made occasional short visits to it.

Property acquired by either spouse during coverture, other than by gift, devise, bequest, or descent is declared to be community property. (Civ. Code, secs. 162, 163, 164.) If these sections stood alone and controlled this case, it might be argued that property acquired by adverse possession by the wife, during the marriage, would be community property and, as such, subject to execution for the debts of the husband. But this argument does not apply to the present case. Section 169 of the Civil Code declares that "the earnings and accumulations of a wife, and of her minor children living with her or in her custody, while she is living separate from her husband, are the separate property of the wife." The word "earnings" according to its ordinary meaning, would not apply to property acquired by adverse possession. But property so acquired and held in ownership would clearly be included in the term "accumulations." When one speaks generally of accumulation of property, he is understood to refer to any property which a person acquires and retains, without regard to the means by which it is obtained. Of course if it were acquired by the wife by purchase with community funds, or in exchange for other community property, it would not be accumulated in the sense here involved. Such an acquisition would be a mere exchange and it would have the character possessed by that given in exchange for it. But where the wife, while living separate from her husband, through her own industry, labor, skill, or efforts of any kind, obtains property and holds it in possession, it is what would ordinarily be called an accumulation of property, and, under the rules stated in section 169, it would be a part of her separate estate.

The decision of this court in *Siddall* v. *Haight*, 132 Cal. 320, [64 Pac. 410], goes even farther than this. There a parol gift of land was made to the wife by her sister and in pursuance of the gift the wife was put in possession of the property. The husband was living with his wife on the property but did not claim any interest therein under the gift. The decision

was that she acquired the title to the property from the donor, by adverse possession in pursuance of the parol gift, and that the character of the property as separate or community was determined by the fact that it first became hers by gift, and that in consequence thereof the title gained by adverse possession was a title in her as of her separate estate.

If it be suggested that title by adverse possession is founded on a presumed grant to her, the result would be the same. Under the provisions of section 164 of the Civil Code such a grant to the wife raises a presumption that it is her separate property.

We conclude therefore that when a husband abandons and deserts his wife, remaining permanently separate from her, and at the same time delivers to her the possession of his land, she may claim title to it as her separate estate and acquire the legal title in fee by adverse possession against him.

The case of *Warr* v. *Honeck*, 8 Utah, 61, [29 Pac. 1117], is substantially to the same effect. There a decree of divorce had awarded to the wife a certain segregated part of the property of the husband. She took and held possession of it thereafter, claiming it as her own, and lived upon it separate and apart from her husband. The decree was absolutely void both as to the property and the divorce. The court held that, notwithstanding the continuance of the marriage relation in point of law, she could and did acquire the title to the land from him by adverse possession.

Some rulings upon the admission of evidence are assigned as error. The testimony of Tebbetts, the father of Mrs. Burton, to the effect that the land in dispute was regarded and treated by Burton and his wife as a part of the Jesus Maria Rancho should not have been allowed. His opinion as to how they treated and considered this land was immaterial and incompetent. But its admission could not have caused any substantial injury to the appellant. The fact that the 139.54 acres when acquired by Burton was immediately fenced so as to be within the same inclosure as the adjoining part of the land previously owned by him, and that it was thereafter maintained in that condition, was proven by other evidence and there was no contradiction thereof; nor was the fact ever disputed. The letter of Burton to Tebbetts, inclosing the deed to Mrs. Burton and directing Tebbetts to deliver it to her,

was admissible to prove the delivery of the deed. Its contents also established the intent of Burton to desert his wife and it was admissible for that purpose. The other alleged errors are so insignificant that we do not consider it necessary to discuss them.

The order is affirmed.

Angellotti, J., and Sloss, J., concurred.