[Crim. No. 929. First Appellate District, Division One.—March 14, 1921.]

## THE PEOPLE, Respondent, v. FRANK THOMAS, Appellant.

[1] CRIMINAL LAW—HOMICIDE—ABORTION—CONDITION OF DECEASED—PURPOSE OF VISIT TO DEFENDANT—EVIDENCE OF DECLARATIONS.—In a prosecution for homicide alleged to have been the result of a criminal abortion performed by the defendant, testimony as to a conversation between the witness and the deceased out of the presence of the defendant in which the deceased stated that she had made an appointment with the defendant, that he wanted to operate on her forthwith, but that she had preferred to wait till a later day, that. he was going to charge a certain sum to perform the operation, that she was going to telegraph to the man responsible for her condition, asking that he send her the money, and that on the day preceding the fatal operation the deceased informed the witness that she had received the money, is admissible, not for the purpose of showing the commission of the offense charged, but to show the condition of the deceased and the purpose of her visit to the defendant.

[2] ID.—EVIDENCE OF ILLEGAL OPERATION—REBUTTAL OF PHYSICIAN'S TESTIMONY.—In such prosecution, a physician who was called in by the defendant to examine the deceased shortly before her death having been called as a witness in behalf of the defendant, and he having testified, in effect, among other things, that it had not occurred to him upon the occasion of such examination that an illegal operation had been performed, testimony of the head of the detective department that in a statement to him such physician, referring to the case, said "this was a dirty mess," is competent evidence in rebuttal.

[3] ID.—CONTRADICTORY STATEMENTS BY WITNESS—ADMISSION—ERROR—MISCONDUCT OF DISTRICT ATTORNEY.—In such prosecution, the

---

1. Homicide in commission of or attempt to commit abortion, notes, 95 Am. Dec. 783; 63 L. R. A. 902; 49 L. R. A. (N. S.) 580.

defendant having introduced a certain written statement, made by an intimate friend of the deceased shortly after the latter's death and at a time when she was disposed to protect the defendant from prosecution and the family of her friend from humiliation and notoriety, for the purpose of discrediting such friend as a witness, the trial court did not commit error prejudicial to the defendant in admitting, on the redirect examination of such witness, a second written statement by her which was contradictory of the first, where such second statement later, on motion, was stricken out; and the conduct of the district attorney in that behalf did not constitute misconduct.

[4] ID.—IMPROPER QUESTIONS—ABSENCE OF INJURY—FAILURE TO ASSIGN AS MISCONDUCT.—On appeal from the judgment of conviction in a prosecution for homicide, the defendant is not in a position to complain of the rulings of the trial court on his objections to certain questions asked by the deputy district attorney, where such questions were either withdrawn or they elicited nothing injurious to defendant's case, and defendant did not at the time assign the asking of such questions as misconduct.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Michael J. Roche, Judge. Affirmed.

The facts are stated in the opinion of the court.

Leo Kaufmann for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

KERRIGAN, J.—The defendant was convicted of murder in the second degree. This appeal is from the judgment, and from an order denying the defendant's motion for a new trial.

The theory of the prosecution was that the homicide was the result of a criminal abortion performed by the defendant, who was a licensed physician. He had a fully equipped office, which was in his home on Franklin Street, in San Francisco. Rose M. White, the deceased, was a young woman about nineteen years of age, in good physical health. On Wednesday, November 20, 1919, she communicated to her intimate friend, Mrs. Blanch E. Clarke, that she was pregnant, mentioned the name of a man who, she said, was

responsible for her trouble. She also stated that she had
been given the name of a doctor who would relieve her of
her condition, and that she intended to make an appoint-
ment with him. Later that day she gave the doctor's name
as Thomas, and informed her friend that the operation
would cost her fifty dollars, also that the doctor desired to
operate at once, but that she had put it off until the
following Friday. Mrs. Clarke suggested to her friend
that she should telegraph to the man whose name she had
given, informing him of her condition and asking for as-
sistance. To this Miss White demurred, but later informed
Mrs. Clarke that she had followed her suggestion, and the
records of the Western Union Telegraph Company which
were introduced in evidence show that she did in fact tele-
graph to the person in question asking for forty dollars,
and that he sent her the money. On Thursday night
Miss White remained with Mrs. Clarke, and the next morn-
ing, on leaving to keep her appointment with the defend-
ant, requested Mrs. Clarke to communicate with her by
telephone in case she did not hear from her by noontime,
at the same time giving to Mrs. Clarke a paper on which
was written a telephone number and also a street address,
which was the telephone number and street address of the
defendant. At the time indicated Mrs. Clarke called up
the number, the call being answered by a woman, Mrs.
Goffoller, the nurse or assistant of the defendant, who, in
reply to Mrs. Clarke's inquiry after Miss White, said she
knew no one by that name. Mrs. Clarke then recalled that
her friend had told her to ask for Mrs. Stevens, and she
accordingly did so, whereupon Mrs. Goffoller stated that
Mrs. Stevens was resting easily, but wanted Mrs. Clarke
to call for her after dinner that evening. She accordingly
called at the office and residence of the defendant, and there
saw the defendant, who stated to her that it had been neces-
sary for him to give Miss White two treatments—one in
the morning, which was unsuccessful, and a second in the
afternoon. Mrs. Clarke found her friend in great pain.
Shortly after Mrs. Clarke's arrival at the office Mrs. Gof-
foller left the house, saying she was going to a dinner party.
Later the defendant answered the telephone, and Mrs.
Clarke heard the voice of a woman at the other end of the
line. The defendant asked the person on the line if Dr.

Kremer had been told about the event and if he was coming down with her. The replies were in the affirmative, and shortly afterward Mrs. Goffoller returned, followed by Dr. Kremer. The defendant told Dr. Kremer that he had treated the deceased about a year before, and that he had found it necessary on that occasion, as on this, to give her a second treatment. The defendant, in response to a query from Dr. Kremer, stated that the deceased was about three months pregnant. Thereupon Dr. Kremer wrote a prescription, and Mrs. Clarke went to have it filled. When she returned, about half an hour later, her friend was dead. Later Mrs. Goffoller said to Mrs. Clarke, ''Will you stand by us?'' the latter promising to do so. She also asked Mrs. Clarke if she would take the body to her apartment, but this was refused. Subsequently one Morris Weintraub, a friend of the defendant, arrived on the scene, and he, the defendant and Mrs. Goffoller retired to another room, where they remained for a short time, when Mrs. Clarke was requested to join them. While there with them Weintraub remarked: ''We will have to fix this up or the doctor will have to go to jail.'' He also suggested that Mrs. Clarke should say that she was walking along the street with the deceased, when the latter fell and was picked up by Mrs. Clarke and brought into the defendant's office. This she refused to do, and she also refused at about this time in the presence of the defendant to accept forty dollars offered to her by Mrs. Goffoller, who in doing so remarked: ''This is the money the doctor got from the girl.''

Miss White died about 10:30 P. M. and about two hours later the defendant, at the instance of Weintraub, reluctantly notified the coroner's office by telephone that a woman had died in his office; that she had come to his office unexpectedly and died suddenly; that he did not know the cause of her death; that he had failed to notify the coroner's office sooner for the reason that the telephone was out of order. Shortly thereafter a deputy coroner, accompanied by Detective Leo Bunner, arrived at the defendant's office. They found blood spots upon a bed, which the defendant in some confusion explained came from himself, he being a sufferer from piles, and when it was pointed out to him that they were on the upper sheet, he stated that he sometimes slept on his stomach. Fresh blood clots were

also found on the defendant's operating-table, although he declared that he had not used it for three months. The telephone was found to be in good order. An examination of the body of the deceased showed that one stocking had been put on inside out; that the hooks and eyes of her dress were improperly fastened, and that her clothes appeared to have been hastily put on. A satchel containing obstetrical instruments was found in the doctor's office.

Dr. John R. Clark, the autopsy surgeon, testified that the death of the deceased was due to a hemorrhage resulting from the procurement of an abortion.

[1] Over the objection of the defendant Mrs. Clarke was permitted to testify to a conversation with the deceased out of the presence of the defendant in which the deceased stated that she had made an appointment with Dr. Thomas, the defendant; that he wanted to operate on her forthwith, but she had preferred to wait till Friday; that he was going to charge her fifty dollars to perform the operation. She also testified that her friend told her that she was going to telegraph to the man responsible for her condition in New York, asking that he send her the sum of forty dollars, and that on the day preceding the fatal operation her friend informed her that she had received the money. Covered by this objection is also the testimony of two witnesses, employees of the Western Union Telegraph Company, showing that the deceased, shortly after her conversation with Mrs. Clarke, had telegraphed to New York for forty dollars, and that she had received said sum as requested. This testimony was not admitted for the purpose of showing the commission of the offense charged, but to show the condition of the deceased and the purpose of her visit to the defendant. For this limited purpose it was competent. (*People* v. *Wright,* 167 Cal. 1, [138 Pac. 349]; *People* v. *Northcott,* 45 Cal. App. 706, [189 Pac. 704].) While this character of evidence is admissible when part of the *res gestae* of a particular phase of the whole transaction (*State* v. *Power,* 24 Wash. 34, [63 L. R. A. 902, 63 Pac. 1112]), some of the above testimony thus admitted over objection was merely narrative of occurrences and therefore not within the rule making it competent; still, as the court instructed the jury that such testimony was not admitted generally, but only to show the condi-

tion of the deceased and the character of her visit to the defendant's office, it is clear that the error, if error it be, was merely technical and without injury to the defendant. As to that part of such testimony showing that the deceased had received by telegraph the sum of forty dollars from New York, this constituted part of the preparation for the visit, and was clearly admissible under the rule announced in *People* v. *Wright, supra.*

[2] Dr. Roy Kremer, the physician who was called in by the defendant to examine the deceased shortly before her death, was called as a witness in behalf of the defendant, and he testified in effect, among other things, that it had not occurred to him upon the occasion of such examination that an illegal operation had been performed. To rebut this testimony Captain Duncan Mathewson, head of the detective force of the police department, was called, and testified that in a statement to him this witness, referring to the case, said "this was a dirty mess." For the purpose offered this evidence was competent.

The contention of the defendant that the testimony of Mrs. Clarke, detailing the conversation between her and the nurse or attendant in the defendant's office, was inadmissible, must be sustained, but it covered no disputed fact in the case, and was wholly without prejudice to the defendant.

[3] Objection was made to the reading of a statement made by Mrs. Clarke. It appears that she had made two written statements which were inconsistent one with the other. The first was made shortly after the death of her friend and at a time when she was disposed to protect the defendant from prosecution and the family of her friend from humiliation and notoriety. It was contradictory of a written statement later made by her and of her testimony given at the trial. The first statement was introduced by the defendant for the purpose of discrediting the witness. On redirect examination her second statement was admitted, but later on motion it was stricken out. The court committed no error prejudicial to the defendant in so ruling, nor did the conduct of the prosecuting attorney in this behalf constitute misconduct.

Complaint is made of the admission of the testimony of Miles Jackson, a detective, concerning a conversation

had with the defendant; wherein the latter, in reply to a question as to why he displayed no physician's sign in connection with his office, replied: "I haven't had any signs on my office since I got into trouble at the time I was on Turk Street." It is urged in support of the admission of this testimony that it was an explanation by the defendant of a suspicious circumstance in this particular case and therefore competent; but assuming, as contended by the defendant, that the object and effect of this testimony was to afford the jury ground for the inference that the defendant had been charged with a prior offense separate from the charge on trial, and that it was inadmissible to prove intent in this class of cases, still, in view of the convincing character of the remaining evidence against the defendant, we would not be warranted in reversing the judgment on account of the admission of this somewhat ambiguous testimony.

[4] During the examination of the defendant as a witness upon the trial, and also of one of the witnesses called in his behalf, the defendant objected to certain questions asked by the deputy district attorney. He is not, however, in a position to complain of the rulings of the court upon them, for they were either withdrawn or they elicited nothing injurious to defendant's case. The defendant now in this court for the first time assigns the asking of such questions as misconduct. Upon this point the record shows that the prosecuting officer cross-examined the defendant as to whether or not he was accustomed to have patients like the deceased; whether he had any similar patients at his home before when miscarriage had taken place. These questions were answered in the negative. The witness was then asked if he knew Myrtle Dean or Myrtle Hanley, but this question, after argument, was withdrawn. Upon the cross-examination of a witness for the defendant the deputy district attorney, for the purpose of showing the witness' friendship for the defendant, asked him if he was not on the defendant's bond. This question was not objected to and was answered affirmatively; whereupon the prosecuting attorney asked him if he had not been upon the defendant's bond on several occasions. This question was in effect withdrawn and was not answered.

The question put to the defendant last above quoted was not proper cross-examination, and, assuming that the question put to the other witness just detailed was not asked in good faith, still, as the asking of this question was not assigned as misconduct nor the court requested to direct the jury to disregard it, and in view of the very strong case made by the people, we cannot regard these matters as justifying a reversal, although in a close case our conclusion might well be otherwise. The law contemplates that the defendant in a criminal case shall be tried according to the rules of law, and while in a given case an appellate court, in view of the convincing character of the evidence, may recognize that it is its duty to affirm the judgment of conviction notwithstanding a disregard by the prosecuting officer of some of those rules, it would be a matter of serious regret if such officer should take advantage of the situation created by the adoption of section 4½ of article VI of the constitution to indulge in such infractions, more especially in view of the comparative helplessness of the defendant under such circumstances. In the present case the evidence, as we have said, is quite convincing of the defendant's guilt. It is admitted that he was a licensed physician; that the deceased was pregnant; that she had made two recent visits to his office, and had been given two treatments by him on the occasion of the second of those visits; that she died in his office as the result of an abortion. The evidence also shows that the defendant informed Dr. Kremer that deceased was three months pregnant; that he asked Dr. Kremer to sign the death certificate; that the defendant's assistant in his presence offered to return to Mrs. Clarke the money received by the defendant from the deceased, and requested Mrs. Clarke to stand by them and to take the body of her friend to her own apartment; that defendant's friend, Weintraub, in his presence remarked: "We must fix this up for the doctor or he will have to go to jail," and at the same conversation, with the same persons present, suggested that Mrs. Clarke should say to the authorities that the deceased was suddenly taken ill on the street in front of the doctor's office, and was conveyed into his office and died. In addition there are the suspicious circumstances of the blood clots on the bed and operating-table, and the defendant's expla-

nation concerning them; the delay in notifying the coroner's office of the death. In view of the evidence in the case we think it is plainly one that falls within the terms of the amendment to the constitution above cited requiring an affirmance of the judgment.

The instructions of the court were fair and fully covered every phase of the case.

The judgment is affirmed.

Richards, J., and Waste, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 12, 1921, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 12, 1921.

All the Justices concurred.