[Crim. No. 4498.   In Bank.   Apr. 26, 1944.]

THE PEOPLE, Respondent, v. FLORENCIO "FRANK" ALCALDE, Appellant.

Joseph P. Bullock for Appellant.

Robert W. Kenny, Attorney General, and James F. Brennan, Deputy Attorney General, for Respondent.

SHENK, J.—The defendant, Florencio "Frank" Alcalde, was convicted of first degree murder and sentenced to suffer the penalty of death. His motion for a new trial was denied. He appealed from the judgment and from an order denying his motion for a new trial.

On Monday morning, November 23, 1942, the body of Bernice Curtis was found in a plowed field adjacent to Alma Road between Palo Alto and Mountain View in Santa Clara County. Death had been caused by a basal fracture of the skull resulting from the application of some blunt instrument or substance. The jaw also showed a fracture. The eyes were blackened and the forehead lacerated. The position of the body was face down, the head and hair were matted with blood, the sod beneath was soaked with blood, the face appeared to have been pressed into the sod, and the head was covered with clods of earth. Bloody handprints were perceptible on the fence boards bordering Alma Road. A woman's shoe, some "bobby" pins, a comb, and some wearing apparel, including Bernice Curtis' black caracul fur coat,

were found on the road near where the body lay. The mate to the shoe was found on the highway several hundred feet away. The circumstances under which the body was discovered indicated unmistakably that Bernice Curtis had been killed with premeditated design.

The defendant's main contention is that the evidence is insufficient to sustain the jury's conclusion that he was the perpetrator of the crime. The evidence was in the main circumstantial.

The deceased was a divorced woman of about thirty years of age. She was described as a "blonde," her hair having been bleached. About four months prior to her death she had gone to San Francisco from Chicago to be with and to assist her married sister and the latter's husband, who were about to become parents. She stayed with them in their home on Sacramento Street until after the event. She then moved to a rooming house on San Jose Avenue where other young women resided and with one of whom she shared a room. She accepted employment at a cigar store located at Powell and Market Streets in San Francisco.

The defendant worked as a welder at the shipyards of the Western Pipe and Steel Company in South San Francisco. He was married and had been residing with his wife and five-year-old daughter in the nearby town of San Bruno on premises owned and also occupied by his father. About November 9, 1942, because of a misunderstanding with his wife, he moved to a hotel in South San Francisco under the assumed name of Frank Galarda.

It was in evidence that the defendant told other workers at the shipyards that he had a "hot blonde" who visited him at his hotel room; that he frequently called her on the telephone; that he showed her picture to his fellow workmen; that he never spoke of her by name, but that he used slang and low expressions in his references to her. Other evidence disclosed that the defendant called Bernice Curtis on the telephone at her rooming house. On the 18th of November, preceding Bernice Curtis' death, the defendant said to a fellow worker that the "blonde" he was going with was the type of girl who wanted to marry, that she didn't know he was married, that he was going back to his wife, and he would "have to get rid of her some way by the week-end." On the morning of Saturday, November 21st, to another fellow worker he showed a picture of a blonde woman and an-

other picture of his wife and daughter. The witness took the picture of the wife and baby from the defendant's hand saying, "You mean to tell me you give up that baby for this girl? There doesn't seem to be any class out of that," to which the defendant replied: "I'll tell you, Pop, I have a date with her tonight. I am going to try to have her" commit an act of sex perversion on me "and get rid of her."

On November 22d Bernice Curtis stated to two persons, her brother-in-law and her roommate, that she was going to dinner that night with "Frank." She spent a portion of the day riding horseback with one of the other young women who lived at the rooming house on San Jose Avenue. Her riding companion saw Bernice board a homeward bound streetcar about 4:30 in the afternoon. That evening at 6:00 her roommate saw Bernice dressing, and it was then that the latter expressed her intention of going out with Frank. The roommate left the house at 6:15 while Bernice was still dressing. Bernice's riding companion arrived home at 6:45 at which time she observed a green sedan in front of the house with a man and woman in it, which was then driven away. The witness testified that she believed that the woman in the car was Bernice.

The defendant owned and drove a faded 1936 green Chevrolet sedan with a dent in the right front door. A green Chevrolet sedan was observed parked near the scene of the crime by a bus driver who saw the black fur coat on the road in the early morning of November 23d. He slowed down to pick up the coat, but "straddled" it before the bus, coasting, could come to a stop. He testified that a little farther up the road, close to the fence, was a parked Chevrolet, "between a '34 and '37, faded paint job, old paint, sort of green colored," with its lights burning, its right front door open, but that the car was unoccupied. He looked at his wrist watch, the hands of which pointed to 12:45, put the bus in gear and drove on, leaving the coat, which was picked up shortly thereafter by another motorist. The bus driver also testified that he saw the car again about a week or ten days later when it was parked at the rear of the sheriff's office in San Jose. The car that he observed at the latter time was admittedly the defendant's car. An impression was made of a tire mark found at the scene of the crime. It showed the same kind of tire as that used by the defendant on his auto-

mobile. The police officer who patrolled the alley to the rear of the hotel in South San Francisco on the morning of November 23d testified that there was only one car there at 12:20, a Chevrolet coupe. He patrolled the alley the next time at 2:20, and then saw also parked in the alley a 1936 green Chevrolet sedan with a flat front tire. He was able to identify it as the defendant's car because on the early morning of, the previous November 20th he saw the same car parked in a restricted outlying district of South San Francisco, when he flashed a light on the defendant and the deceased, whom he recognized later from a photograph, and examined the defendant's operator's license. The period between 12:45 and 2:20 a. m. was ample time within which to cover the distance between the scene of the crime and the hotel in South San Francisco by automobile.

There was testimony that hair found on the ceiling of the defendant's car was identical with the decedent's hair, some of which was received in evidence. A fingerprint found on the rear-view mirror was shown to be identical with the thumb print of the decedent. A bit of dyed feather found at the scene of the crime was identical with feathers in the defendant's hat. Particles of human blood were found on a coat belonging to the defendant and which he was wearing on the evening of November 22d. On the Monday or Tuesday following the night of the crime the defendant took his soiled linen to a different laundry from that which he had been in the habit of patronizing. The inside of the car was quite damp indicating that it had been washed. Spots on the upholstery reacted positively to the presumptive blood test. There was a fracture on the right front side of the windshield of the defendant's car which a witness testified was not there before the 23d of November, but which he observed for the first time on the 24th.

Upon his apprehension the defendant denied that he knew Bernice Curtis, that he ever bought flowers or gave flowers to her, or that he ever took her out. On the trial he took the stand in his own defense and there admitted that those statements were false. He testified that he met the deceased at a public dance in San Francisco about three weeks prior to November 22, 1942; that he took her to other dances, drove her about in his car, bought her corsages, and that on one occasion she visited him at his hotel room in South San Francisco. He claimed that the last time he saw her was on Sat-

urday night, November 21st, when he drove her home from a dance. He attempted to establish that on November 22d he arrived at the hotel from work about 4:30 in the afternoon and parked his car in the alley; that the car was not again removed until 6:30 or 7:00 the next morning. He testified that he played rummy in a pool hall from about 6:30 until 9:00 on Saturday evening with his father and two friends whom he named; that he told his father he was going back to his wife; that he went to the car, discovered the tire was flat, and telephoned his home; that there was no answer, so he went back to his hotel room about 9:30 and to bed; that about 11:30 that night he heard a friend coughing in the adjoining room, inquired the trouble, and received an answer. His testimony in this respect was directly contradicted by the men he hoped would corroborate him. They testified that they did not see him after six o'clock on the evening of the 22d; that the conversation about the cough did take place but that it occurred about nine o'clock on the morning of the 23d. The only witness who testified in support of the defendant's asserted alibi was his father who stated that he left his son at nine o'clock on the night of November 22d, when the defendant said to him, ''Tell my wife I come home tomorrow.'' But the father was discredited by evidence that he offered to pay two witnesses ''good and well'' if they would testify that the defendant was in his hotel room at 9:30 on the night of November 22d.

The defendant also testified that about 6:30 or 7:00 on the morning of November 23d he changed the valve on the wheel carrying the flat tire, put air in the tire, and went to his home in San Bruno where he washed the car, although it was raining, and that his wife brushed out the interior. He admitted that he returned to the hotel about nine o'clock the same morning to get his clothes. He stated that the fracture in the windshield of his car occurred in the previous month of June. To officers before the trial he said that it had happened some time ago when he ''slammed on'' his brakes and a girl he had with him struck her head against the windshield.

Without recounting further details appearing in the record it becomes apparent from the foregoing narrative that the circumstantial evidence was sufficient to connect the defendant with the commission of the crime and to establish beyond a reasonable doubt that he was the perpetrator thereof.

In *People* v. *Nagy,* 199 Cal. 235, 236 [248 P. 906], it was said: "Circumstantial evidence is legal evidence and may be as conclusive in its convincing force as the testimony of direct witnesses to the overt act. Circumstances very largely control the conduct of men in the most important affairs of life and may be sufficient to justify a conviction of crime where they are such as to exclude any other reasonable theory than that of the guilt of the accused." That circumstantial evidence may be as convincing in its force and as conclusive as the testimony of witnesses to the overt act was reiterated in *People* v. *Latona,* 2 Cal.2d 714, 725 [43 P.2d 260], where it was said: "The right to draw proper inferences from the evidence is a function of the jury; and as long as its conclusions do not do violence to reason, an appellate court is not permitted to substitute its finding of the ultimate fact for that reached by the constitutional as well as the statutory arbiter thereof."

The defendant relies on *People* v. *Lamson,* 1 Cal.2d 648 [36 P.2d 361], wherein the judgment of conviction was reversed. As stated heretofore that case decided nothing except that the judgment be reversed. (*People* v. *Newland,* 15 Cal. 2d 678, 681 [104 P.2d 778].) In the Newland case it was said: "If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury," citing numerous cases.

In the present case the sufficiency of the evidence to prove premeditated murder may not fairly be questioned. The record otherwise is sufficient to support the conclusion of the jury that the inferences to be drawn therefrom were consistent with the defendant's guilt and inconsistent with any other rational hypothesis.

The defendant claims that prejudicial error resulted from the trial court's ruling permitting the cross-examination by the prosecution of the defendant's father on the question of his alleged offer to pay two witnesses to testify, contrary to the fact, that they saw the defendant in the hotel at 9:30 p. m. on November 22d. The ruling was not erroneous. A witness who has testified to material matters may be cross-examined as to his attempt to bribe other witnesses and it may be shown by other witnesses that he offered bribes to obtain false testimony. The father testified to a material

matter which, if true, would tend to establish the defendant's alibi. The attempt to suborn witnesses, if proved, is material in weighing the testimony of the one guilty of the attempt. (*People* v. *Wong Chuey,* 117 Cal. 624 [49 P. 833]; 27 Cal. Jur. p. 125.)

The defendant contends that prejudicial error was committed by admitting in evidence over the defendant's objection the declarations of the decedent made on November 22d that she was going out with "Frank" that evening. In overruling the objection the court took the precaution to state in the presence of the jury that the evidence was admitted for the limited purpose of showing the decedent's intention. It is argued by the defendant that declarations not under oath, made when the declarant is not confronted by the adverse party, are admissible to prove physical or mental condition and only when either condition is a matter in issue. The admission of such utterances, due precaution having been taken by the court as here, is not so limited.

This is not a case such as *People* v. *Wright,* 167 Cal. 1 [138 P. 349], or *People* v. *Thomas,* 51 Cal.App. 731 [197 P. 677], where the defendant was charged with homicide resulting from criminal abortion and the physical condition of the decedent was a matter in issue. Nor is it a case such as *Estate of Snowball,* 157 Cal. 301 [107 P. 598], or *Bridge* v. *Ruggles,* 202 Cal. 326 [260 P. 553], where the mental state of the declarants was material on issues of duress and undue influence. In those cases the declarants' utterances were received in evidence not to prove their truth, but to indicate the mental condition of the declarants. (See, also, *Adkins* v. *Brett,* 184 Cal. 252 [193 P. 251]; *Estate of Carson,* 184 Cal. 437 [194 P. 5, 17 A.L.R. 239].) In the present case the decedent's mental condition at the time of her declaration was not an issue, and her utterance could not be offered as proof thereof. Her utterance was hearsay. It was made extrajudicially and offered as proof of the truth of its content. It was a declaration of intent to do an act in the future, offered as evidence that the deceased had the intent she declared and that the intent was probably carried out, namely, that she intended to and did go out that night with a man named "Frank."

From the declared intent to do a particular thing an inference that the thing was done may fairly be drawn. Such

declarations have been deemed admissible where they possessed a high degree of trustworthiness. Where they are relevant to an issue in the case and the declarant is dead or otherwise unavailable the necessity for their admission has been recognized. *Mutual Life Insurance Co.* v. *Hillmon,* 145 U.S. 285 [12 S.Ct. 909, 36 L.Ed. 706], appears to be the leading case on the admissibility of declarations of intent to do an act as proof that the act thereafter was accomplished. The courts of this state have followed what is deemed to be the weight of authority (see Wigmore, Evidence, 2d ed. 1923, § 1725; 19 Cal.L.Rev. 231 and 367; 35 Harv.L.Rev. 302, 444) to the effect that declarations of present intent are admissible to prove a future act. In cases of homicide the admissibility of uncommunicated threats of the deceased against the defendant has been upheld to show that the declarant was the aggressor. (*People* v. *Arnold,* 15 Cal. 476; *People* v. *Scoggins,* 37 Cal. 676; *People* v. *Alivtre,* 55 Cal. 263; *People* v. *Thomson* 92 Cal. 506 [28 P. 589]; *People* v. *McGann,* 194 Cal. 688 [230 P. 169]; *People* v. *Spraic,* 87 Cal.App. 724 [262 P. 795].) Declarations by the deceased of an intent to commit suicide have been held admissible. (*Rogers* v. *Manhattan Life Insurance Co.,* 138 Cal. 285 [71 P. 348]; *Benjamin* v. *District Grand Lodge,* 171 Cal. 260 [152 P. 731]; *People* v. *Tugwell,* 28 Cal.App. 348 [152 P. 740]; see, also, *Wilbur* v. *Emergency Hospital Assn.,* 27 Cal.App. 751 [151 P. 155].)

In *Estate of McNamara,* 181 Cal. 82 [183 P. 552, 7 A.L.R. 313], involving the issue of paternity, a declaration of intention of the husband to leave his home and go to a distant city was held admissible to show that the declarant actually went where he said he was going. The court said, in reliance on *Mutual Life Insurance Co.* v. *Hillmon, supra,* that it was well established that declarations of intention were admissible under such circumstances. In *Union Oil Co.* v. *Stewart,* 158 Cal. 149 [110 P. 313, Ann.Cas. 1912A 567], an action to quiet title, a husband's declaration of intent to desert his wife was admitted as bearing upon the fact of desertion.

In *People* v. *Thomas, supra,* a declaration of intent to go to the defendant's office for an operation was admitted as proof that the intention was carried out. Admissibility of a declaration of intent to go to a certain place was upheld in the case of *People* v. *Fong Sing,* 38 Cal.App. 253 [175 P. 911], where the defendant sought to rely on his own declara-

tion to establish an alibi. (See, also, *People* v. *Burke,* 18 Cal.App. 72 [122 P. 435].)

In other jurisdictions cases are found which recognize the admissibility of declarations of intent to go to a certain place or with a certain person in the future. (*Hunter* v. *State,* 40 N.J.L. 495; *State* v. *Hayward,* 62 Minn. 474 [65 N.W. 63]; *State* v. *Mortensen,* 26 Utah 312 [73 P. 562, 633].)

█ In some of the cases the declaration of an intent to do a certain act in the future has been admitted as a part of the res gestae. But such declarations are not, strictly speaking, part of the transaction. They are not encompassed within section 1850 of the Code of Civil Procedure. They more properly fall within section 1870, subdivision 15, as one of ''Any other facts from which the facts in issue are presumed or are logically inferable.'' Greenleaf on Evidence, vol. 1, 16th ed., § 162, points out that the existence of a person's design or plan to do a certain thing is relevant circumstantially to show that he did it, and may be evidenced by his assertion of present intent when made in a natural way and not under circumstances of suspicion; that the declaration is admissible not properly as part of the res gestae, but merely as an exception to the general rule excluding hearsay evidence; that where such declarations have been excluded it has usually been due to a misapplication of the res gestae doctrine. Some courts have expressly rejected any necessity for concluding that they were part of the res gestae. (*Commonwealth* v. *Trefethen,* 157 Mass. 180 [31 N.E. 961, 24 L.R.A. 235]; *State* v. *Mortensen, supra.*)

No attempt need be made here to define or summarize all the limitations or restrictions upon the admissibility of declarations of intent to do an act in the future or to indicate what degree of unavailability or corroboration should exist in every case. Elements essential to admissibility are that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case. Those qualifications are here present. █ The declaration of the decedent made on November 22d that she was going out with Frank that evening stated a present intention to do an act in the future. Certainly it was a natural utterance made under circumstances which could create no suspicion of untruth in

the statement of her intent. It did not necessarily refer to the defendant as the person named. But the defendant was called "Frank" as a nickname and he registered as Frank at the hotel where he lived. The defendant admittedly had been entertaining the decedent. Manifestly that fact, together with other corroborating circumstances, bore directly on the question of the relevancy of the declaration. Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant. But the declaration was not the only fact from which an inference could be drawn that the deceased was with the defendant that night. Other facts were in evidence from which the inference could reasonably be drawn. The cumulation of facts corroborative of the guilt of the defendant was sufficient to indicate that the trial court did not err in admitting the declaration.

▇ The trial court refused to instruct the jury at the defendant's request on the subjects of second degree murder and manslaughter. The court submitted to the jury the alternatives of finding the defendant guilty of first degree murder or of acquitting him. The defendant assigns the refusal to instruct as requested and the instruction given as prejudicial error.

Instructions are to be given with reference to the facts before the jury. The facts unquestionably pointed to a premeditated homicide. No defense was offered by the defendant except that of alibi. It is proper to refuse to give an instruction as to a lesser degree, or as to an included lesser offense, if the evidence warrants only a verdict of first degree murder in the event the accused is guilty at all. (*People* v. *Watts*, 198 Cal. 776, 793 [247 P. 884]; *People* v. *Lapara*, 181 Cal. 66, 73 [183 P. 545].) There was therefore no error in the refusal to give the requested instructions or in the giving of the instruction complained of. Furthermore it appears from the record that the defendant had a full and fair trial and that the jury was otherwise correctly instructed.

▇ During the deliberations of the jury a sheet of foolscap paper was delivered to the trial judge on which was written the question, with emphasized words as indicated, "May we render a decision of life imprisonment *and not eligible for parole?*" followed by the foreman's signature. The judge returned the paper to the foreman with the notation thereon,

"The answer is 'No'." Prejudice is asserted because of this communication between the judge and jury out of the presence of the defendant and his counsel.

It has been said that courts are practically unanimous in holding that private communications between court and jury are improper, and that all communications should be made in open court. (*Dodge* v. *United States,* 258 F. 300 [169 C.C.A. 316].) Ordinary procedure would require that the trial judge afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be deemed irregular. But in this instance the court could not have responded by any other answer than "No" or its equivalent, namely, that the jury was to be guided solely by the instructions already given. The answer of the trial judge could properly have been made over the objection of the defendant or his counsel if the ordinary procedure had been followed. The episode may not be deemed to be prejudicial, and would therefore not justify a reversal of the judgment or of the order denying the motion for a new trial.

The judgment and the order are affirmed.

Gibson, C. J., Curtis, J., Carter, J., and Schauer, J., concurred.

TRAYNOR, J., Dissenting.—It is my opinion that the trial court erred in admitting the testimony that the deceased said on November 22d that she was going out with "Frank" that evening. A declaration of intention is admissible to show that the *declarant* did the intended act, if there are corroborating circumstances and if the declarant is dead or unavailable and hence cannot be put on the witness stand. (See McBaine, *Admissibility in California of Declarations of Physical or Mental Condition,* 19 Cal.L.Rev. 231, 371, 378.) A declaration as to what one person intended to do, however, cannot safely be accepted as evidence of what another probably did. (See Maguire, *The Hillmon Case—Thirty Three Years After,* 38 Harv.L.Rev. 709, 717, 719.) The declaration of the deceased in this case that she was going out with Frank is also a declaration that he was going out with her, and it could not be admitted for the limited purpose of showing that she went out with him at the time in question without necessarily showing that he went with her. In the words of

Mr. Justice Cardozo, "Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed." (*Shepard* v. *United States*, 290 U.S. 96, 104. [54 S.Ct. 22, 78 L.Ed. 196].) Such a declaration could not be admitted without the risk that the jury would conclude that it tended to prove the acts of the defendant as well as of the declarant, and it is clear that the prosecution used the declaration to that end. There is no dispute as to the identity of the deceased or as to where she was at the time of her death. Since the evidence is overwhelming as to who the deceased was and where she was when she met her death, no legitimate purpose could be served by admitting her declarations of what she intended to do on the evening of November 22d. The only purpose that could be served by admitting such declarations would be to induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her. Her declarations cannot be admitted for that purpose without setting aside the rule against hearsay.

The evidence in question was so damaging to the defendant that it cannot reasonably be said that it probably had no effect on the jury's verdict. (*People* v. *Putnam,* 20 Cal.2d 885, 892, 893 [129 P.2d 367].)

Edmonds, J., concurred.