[Crim. No. 1441.   Fourth Dist.   Feb. 8, 1960.]

THE PEOPLE, Respondent, v. VERNEDIA VIVIAN
HAWKINS, Appellant.

Edgar G. Langford and J. Perry Langford for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David B. Allen, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—Defendant-appellant was charged by indictment in Count I with the murder of Estelle Logans on May 1, 1959, in violation of section 187, Penal Code, and in Count II with the crime of abortion upon one Ruby Love on April 7, 1959, in violation of section 274, Penal Code. A jury verdict of guilty on both counts was returned. The degree of murder was fixed at second degree.

Counsel for defendant, in his brief, states that he makes no contention as to the validity of the conviction of defendant on the abortion charge contained in Count II.

The People's evidence shows that Ruby Love, sister of Estelle Logans, had known defendant for some time; that she (Ruby) became pregnant about January 15, 1959, and six weeks later was examined by her physician on March 3, 1959, for pregnancy and again about March 19 for vaginitis; that Ruby went to defendant's home to "get rid of the baby" about April 1, 1959; that defendant took her into her bedroom, used a speculum and inserted a catheter into the cervix of her uterus. Ruby paid defendant $75 for this service. She was told by defendant to leave the catheter therein and go home. That night she began suffering some pain and hemorrhaging. The next morning Ruby removed the catheter. A week later she again called on defendant. Defendant replaced the catheter and that night bleeding again started. Ruby removed the catheter and hemorrhaging began. She lost so much blood that a doctor was called and she was taken to a hospital. The doctor testified generally that he then examined her; that she was in shock, hemorrhaging and there were incomplete products of conception remaining in the vaginal vault. The placenta was removed manually. Blood transfusions were administered to her. There was no evidence of fetus. In his opinion, an abortion was not necessary to save her life.

Ruby testified her sister Estelle talked with her about Estelle's pregnancy; that Estelle told her she was going to

see the defendant herein; that on the next day she visited Estelle in her home and Estelle was having cramps and pains and the following day she was worse; that at Estelle's request Ruby contacted defendant by telephone (giving the unlisted telephone number defendant had given her); that she told defendant Estelle was having cramps and defendant told her to obtain some particular kind of pills to give Estelle for the pain; that about 2 a. m. the fetus passed; that she took Estelle to the hospital; that Ruby then called defendant and talked to her; that defendant said she didn't know what to do and told her not to mention defendant's name "whatever you do" and that Ruby later brought the fetus to the hospital. Photographs of it were received in evidence. The attending physician and pathologist testified generally that on May 5 Estelle was in complete shock; a vaginal examination was made which revealed that the placenta was still inside the uterus; that in an endeavor to obtain her previous history Estelle told him that "someone had slipped something inside of her a few days previously" and she had passed a fetus at home; that she was taken to surgery and they found the membrane to be ruptured and infected and an area of old, dark hematoma, or blood formation, was found. She died the next day. In the doctor's opinion, the cause of her death was an overwhelming infection she had when he first saw her and the introduction of a catheter into the uterus could have caused the membrane to rupture and it might introduce infection, which would lead to death; and that he saw no evidence that would indicate it was a spontaneous abortion that started the process. There was testimony that an abortion was not necessary to save her life.

A witness saw defendant and Estelle in a car together on May 1 at about 1:30 p. m. and talked with them. On the day of Estelle's death, her mother found a rubber catheter while cleaning Estelle's bedroom.

Another witness, who had previously received an abortion from defendant and paid $75 for it, testified that the morning Estelle died she went with the police and pointed out defendant's house. The abortion procedure she described was quite similar to that described by Mrs. Love. Armed with a search warrant, the officers searched defendant's home. Defendant told them she knew nothing about an abortion and had no instruments used for that purpose. They found in a bureau drawer a catheter wrapped inside a newspaper. Defendant told them some lady had left it there. When they

were about to search the closet, defendant stepped in front of the officer, pulled out a bag and handed it to him. In it were two vaginal specula, a heavy wire or probe similar to a coat hanger, and several other specula were found in the room. A white sheet with bloodstains on it was found in a back bedroom. At first defendant denied knowing anything about these articles. She claimed some unidentified person left them there. Later she admitted the purse in which one of the specula was found belonged to her. After defendant was placed under arrest for murder, she asked who was involved. The officer mentioned the name Estelle Logans. Defendant replied, "Well, I don't even know the lady" and denied ever seeing her. An examination of the sheet, specula and catheters revealed that they had human blood on them, Type A, the same type as Estelle Logans. Defendant denied she ever performed an abortion on anyone or that she knew how to do it. Later she claimed one Martha Williams brought the instruments to her home in a bag and left them there. Martha Williams said she was in defendant's home once, about three and a half years prior to that time, and that she never took these articles to defendant's home.

Defendant, at the trial, admitted knowing Mrs. Love and later stated that she recognized a picture of Mrs. Logans and that Mrs. Logans did come to her door on one occasion and she, defendant, gave her the bag of instruments here mentioned and that she later returned them. Although thoroughly impeached, there were other witnesses produced by defendant who attempted to corroborate this story. Defendant admitted receiving two telephone calls from Mrs. Love about 1 a. m. on May 2 in reference to her sister being sick and in distress and that Mrs. Love asked her what to do and said she had "taken" the baby and cut the cord with a razor blade. Defendant said she advised Mrs. Love to take her sister to the hospital. She said there was blood on the instruments when they were returned to her and that she washed them.

Defendant claims this evidence was insufficient to establish the corpus delicti because there was no sufficient showing that deceased herself did not insert the catheter which ultimately caused her death.

The usual rule is that we must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then de-

termine whether such facts are sufficient to support the verdict. ■ Before a verdict can be set aside on appeal, it must be made clearly to appear that upon no hypothesis is there sufficient substantial evidence to support the conclusion reached in the court below. (*People* v. *Tom Woo,* 181 Cal. 315, 326 [184 P. 389]; *People* v. *Peete,* 54 Cal.App. 333, 342 [202 P. 51]; *People* v. *Wright,* 167 Cal. 1 [138 P. 349].)

■ With these rules in mind, even apart from the history which Estelle Logans gave to the doctor on admission to the hospital, there are sufficient circumstances in the record which the jury could have relied upon in deciding that the defendant, rather than the deceased, inserted the catheter. Deceased's statement to Mrs. Love that she was "going to go and see Vernedia" was admissible. (*People* v. *Alcalde,* 24 Cal.2d 177, 186 [148 P.2d 627].) This statement, when considered in connection with the telephone calls by Mrs. Love with defendant in reference to Estelle's condition and her recommendation as to treatment; the finding of abortion instruments, etc., in defendant's home, as indicated, and her false explanations accounting for their presence; plus the fact that she had performed an abortion on Mrs. Love and two other women in a similar fashion on previous occasions and being seen with deceased on May 1, clearly demonstrate a consciousness of guilt on the part of defendant, and when considered in connection with the medical testimony, there was sufficient proof of the corpus delicti and sufficient evidence to justify the finding of the jury and the trial court on a motion for new trial that the catheter was inserted by defendant rather than by the deceased herself. (*People* v. *Wayne,* 41 Cal.2d 814, 822 [264 P.2d 547]; *People* v. *Roy,* 175 Cal.App.2d 551, 555 [346 P.2d 415]; *People* v. *Pierson,* 69 Cal.App.2d 285 [159 P.2d 39]; *People* v. *Miner,* 96 Cal. App.2d 43 [214 P.2d 557]; *Opper* v. *United States,* 348 U.S. 84 [75 S.Ct. 158, 164, 99 L.Ed. 101].)

■ The opinion of the attending physician of Mrs. Logans that her abortion was not a spontaneous one, based upon his examination and findings and the history given him by deceased that three or four days previously someone had slipped something inside her, was admissible. (*People* v. *Brown,* 49 Cal. 2d 577, 585 [320 P.2d 5]; *People* v. *Wilson,* 25 Cal.2d 341 [153 P.2d 720].)

■ Defendant objected generally to the admission of this testimony relating to what the deceased, Estelle, said, relying upon *People* v. *Wright,* 167 Cal. 1 [138 P. 349]; *Peo-*

*ple* v. *Thomas*, 51 Cal.App. 731, 735 [197 P. 677] ; *People* v. *Northcott*, 45 Cal.App. 706 [189 P. 704]. The court, in the Wright case, said such declaration is hearsay as direct proof of the commission of the abortion but can be properly admitted as evidence establishing the condition of the woman and the avowed purpose of her visit. Nowhere in the instant case did defendant request the court to instruct the jury that the consideration of this testimony should be limited to this purpose. Ordinarily, unless vital to the correct determination of the case, this point is unavailable on appeal unless a request for such an instruction is made. (*People* v. *Findley*, 132 Cal. 301, 306 [64 P. 472] ; *People* v. *White*, 50 Cal.2d 428 [325 P.2d 985] ; Witkin, California Evidence 741, § 709.)

Even if we assume that under the evidence such an instruction should have been given on the *court's own motion,* we conclude, from an examination of the entire cause, including the evidence and the instructions given, that no prejudicial error resulted. (Cal. Const., art. VI, § 4½ ; *People* v. *Watson* 46 Cal.2d 818, 835 [299 P.2d 243] ; *People* v. *Nolan,* 126 Cal. App. 623 [14 P.2d 880] ; *Estate of Hampton,* 55 Cal.App.2d 543 [131 P.2d 565].)

Judgment and order denying new trial affirmed.

Shepard, J., and Coughlin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 30, 1960.