[Civ. No. 5203. Second Appellate District, Division Two.—April 23, 1929.]

CLARENCE S. TENNANT et al., Respondents, v. W. C. WILDE et al., Appellants.

O. E. Mark and W. C. Wilde for Appellants.

Sloane & Sloane for Respondents.

BURNELL, J., *pro tem.*—Plaintiffs, by their amended complaint and an "amended amendment" thereto sought to recover a balance alleged to be due on a promissory note executed by defendants in the original sum of $3,000; and in a second cause of action set up the written instrument which is the bone of contention in this appeal and which is as follows:

"I hereby agree to work as a carpenter in the carpenter work to be done by W. C. Wilde on the 'Court Hotel' building now at No. 1451 State Street, San Diego, California, until all of the same has been fully completed as an 18-apartment building according to general plans and specifications thereof supplemented by oral agreement as to details, and hereby agree and guarantee that the cost of all labor and material necessary therefor shall not exceed three thousand dollars. That said work shall be proceeded with as rapidly as possible at all times, using and employing all labor that can be advantageously used and employed to the end that said work may be completed at the earliest possible date.

"All work to be done first-class and everything to be done in such way as to give the entire building a good and well finished and harmonious appearance, for improved and modern apartment house purposes, and any incidental matters necessary therefor shall be considered included.

"This agreement shall bind and inure to the benefit of the respective parties hereto, their heirs, executors, administrators, and to their assigns except as herein otherwise provided.

"Dated at San Diego, California, this 28th day of November, 1922.

"C. S. TENNANT.

"Accepted,
"W. C. WILDE."

This count alleges that plaintiff Clarence S. Tennant thereby "undertook and agreed, for the sum of $3,000 to supply materials and labor for certain work on the Court Hotel Building" and that the actual cost did not exceed $2,500 and asks judgment for the difference of $500.

Defendants' answer denied any indebtedness on the note and by way of counterclaim and set-off set up the same instrument, alleging that thereby said Tennant "agreed and guaranteed that the cost of all labor and materials necessary for the full completion of the carpenter work of the building therein mentioned, according to general plans and specifications thereof, supplemented by oral agreement as to details, shall not exceed $3,000," but that the cost upon completion exceeded $4,106.85, the difference between which figure and $3,000 they claimed as a set-off.

The trial was by jury and both parties agree that the sole question involved on this appeal is whether the trial court erred in instructing the jury with respect to the above instrument. The instruction complained of by appellants is as follows:

"As an offset to this claim, the defendant has set up, first, a counterclaim for some eleven hundred odd dollars, for an alleged agreement that the cost of a certain alteration of a building would not exceed $3,000. For the reason that this so-called contract lacks mutuality,—that is to say, for the reason that if the defendant had breached the contract and had failed to employ the plaintiff there could be no recovery by the plaintiff, the court holds that this contract has no validity and that there can be no recovery by the defendant on account of this contract."

The plaintiffs introduced no evidence upon the cause of action set up by their amendment to the amended complaint wherein said instrument was pleaded, and dismissed the same just before the case went to the jury.

Upon defendants' offer of the contract in evidence in support of their counterclaim the following proceedings took place:

"Mr. Harrison G. Sloane: Plaintiffs will object to such offer and to the admission of the contract as a basis for establishing a claim of surplus here on the ground that the contract makes no such provision. There is no construction of the contract which makes the plaintiffs in this case liable for an excess in the cost of construction.

"The Court: I do not know exactly what it is they guarantee; but they absolutely guarantee the cost of labor and material necessary therefor.

"Mr. Mark: May it please the Court, and counsel, I think that is an exhibit—the contract itself is an exhibit in the pleading denominated 'Amendment to complaint,' on the part of plaintiffs. The specifications are not, but the specifications are referred to and are necessary in the construction thereof. There is the guaranty to which your Honor has referred.

"The Court: The contract, of course, offered here is incomplete, because you would have to have the specifications here to see what it was he guaranteed would cost only $3,000.

"Mr. Mark: And that we wish to proceed to offer in evidence.

"Mr. W. A. Sloane: Our contention is that the word 'guarantee' there does not create the kind of obligation they are seeking to enforce here as against this defendant.

"The Court: If it means anything, that is what it means.

"Mr. W. A. Sloane: We claim that it does not mean anything, does not create any liability. It is not a guaranty, especially under the statutory definition of 'guaranty,' by which is meant to stand good for the debts or obligations of another.

"The Court: On the face of it, its ordinary meaning, they guarantee that is all it would cost him; but it would have to be offered in connection with the specifications.

"Mr. Mark: We offer the contract, with the specifications annexed.

"The Court: Where are the specifications?

"Mr. Mark: Annexed. May it be admitted, Your Honor?

"The Court: Yes."

The objection was to the admission of the contract. When it was offered in connection with the specifications this objection was not renewed. Thereafter, and without objection on the part of plaintiffs, defendants introduced in evidence a number of letters and telegrams between the parties antedating the agreement in question and which tend to throw considerable light upon the relation of the parties, the meaning of the agreement and the intention of those who executed it. Respondents here for the first time make the point that this correspondence tended to vary the terms of the written contract. This objection comes too late. It is an almost elementary rule that a party cannot

urge, for the first time on appeal, objections which might have been obviated if made in the court below. (*Title Ins. & Trust Co.* v. *California Development Co.*, 171 Cal. 227 [152 Pac. 564]; *Swayne & Hoyt* v. *Wells-Russell & Co.*, 169 Cal. 204 [146 Pac. 686]; *Milwaukee Mechanics' Ins. Co.* v. *Warren*, 150 Cal. 346 [89 Pac. 93]; *Campbell* v. *Genshlea*, 180 Cal. 215 [180 Pac. 336]; *Timmons* v. *Joplin*, 157 Cal. 15 [106 Pac. 228].) We believe, however, that even if objection had been made to this correspondence it would have been properly admitted as an aid to the interpretation of an ambiguous document. (Code Civ. Proc., secs. 1856, 1860.)

The learned trial judge gave the instruction above quoted under the theory that the agreement of November 28, 1922, lacked mutuality, as is evident from the language of the instruction itself and from a statement by the court at the close of the evidence, as follows:

"The Court: . . . There is no contract at all because it is utterly indefinite. There is nothing definite as to time. If the defendant had not sought to continue it, there would have been no measure for damages. There is nothing he could allege or prove as to how long his employment was to last; no agreement that he would employ him for any particular length of time. Call in the jury."

It is upon this point that respondents argue for an affirmance of the judgment. They urge that the contract is severable, one part being a promise by plaintiff Clarence S. Tennant, to work as a carpenter and the other, his alleged guarantee that cost of labor and material should not exceed $3,000, and that it is the guarantee which lacks mutuality.

 On this point it may be said that where there is consideration for any of the agreements specified in a contract the contract as a whole cannot be said to lack mutuality or consideration nor can any particular promise or agreement contained therein be singled out and deemed inoperative because no special or particular consideration appears to have been given or promised for it. Mr. Page in his Law of Contracts thus states the rule:

(At pp. 861 and 862) "While a consideration is a necessary element of every contract, it is not necessary that each separate promise or covenant should have a distinct consideration. If there is but one consideration offered in

return for several promises, and it is accepted for them together, it will support them. This principle is often invoked in question of mutuality of obligation. If A gives value for two or more promises from B, B cannot claim that one of such promises was not supported by consideration, though the parties have not apportioned the consideration to the separate promises . . . "

(At p. 863) "The purchase price is not only consideration for a sale, but also, if so agreed upon, for a warranty, . . . or to accept payment in notes of a third person and to indemnify the purchaser against liability on his indorsement of such notes."

(At p. 866) "Rendition of services is a consideration for a covenant to pay both for such services and for services already rendered for which the promisor was not legally liable."

It is contended on the one hand that the contract is merely one whereby Tennant agreed to perform carpenter work on a building being constructed for appellants, and as such carpenter, could have no control over the cost of carpenter work or labor and could not possibly guarantee the cost of either or both, and on the other, that the parties understood and attempted to express the fact that Tennant was to be responsible for the carpenter work, whether physically done by himself or by others in connection with him or under his direction. There is no question as to the ambiguity of the instrument itself. It starts off with the words "I hereby agree to work as a carpenter in the carpenter work to be done by W. C. Wilde on the 'Court Hotel Building,'" then follows an agreement and guarantee as to "the cost of all labor and material necessary therefor" and the statement "That said work shall be proceeded with as rapidly as possible at all times, *using and employing all labor* that can advantageously be used and employed to the end that said work may be completed at the earliest date." (Italics ours.) This in turn is followed by the statement "All work to be done first class . . . " The first sentence, if it stood alone, would seem to indicate that the parties had in contemplation merely the hiring of Tennant as a journeyman carpenter, but the rest of the instrument clearly implies a much different class of employment. The provision that "the work shall be proceeded with as rapidly as possible

and at all times using and employing all labor that can be advantageously used and employed'' certainly implied that Tennant obligated himself to employ and direct sufficient labor to achieve speedy completion, while that requiring ''all work to be done first class and everything to be done in such a way as to give the entire building a good and well finished and harmonious appearance'' implied something more than mere labor as a journeyman carpenter on his part. To what end the requirement that *the entire building* should be given a well-finished and harmonious appearance, if Tennant was merely employed as one of the carpenters, without power or authority to direct and supervise the work of others?

It is our duty to so interpret this contract ''as to give effect to the mutual intention of the parties as it existed at the time of contracting, *so far as the same is ascertainable*'' (Civ. Code, sec. 1636). (Italics ours.) ''The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'' (Civ. Code, sec. 1641.) We must also give it ''such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties'' (Civ. Code, sec. 1643). After all, the essential theory in construing any contract is to find out what the parties meant, and this must be done by an examination of the language used therein, provided the same is ''clear and explicit'' (Civ. Code, sec. 1638). Where the language, as in the instrument under discussion, is neither clear nor explicit, resort may be had to ''the circumstances under which it was made and the matter to which it relates.'' (Civ. Code, sec. 1647; Code Civ. Proc., secs. 1856, 1860.) For this purpose it is proper to consider the relations between the parties, the work to be done and the correspondence leading up to the execution of the agreement (*Williams* v. *Ashurst Oil Co.,* 144 Cal. 619 [78 Pac. 28]; *Payne* v. *Neuval,* 155 Cal. 46 [99 Pac. 476]).

As was said in *Balfour* v. *Fresno Canal Co.,* 109 Cal. 221 [41 Pac. 876]:

'' 'If, however, the language employed be fairly susceptible of either one of the two interpretations contended for, without doing violence to its usual and ordinary import, or some established rule of construction, then an ambiguity arises,

which extrinsic evidence may be resorted to for the purpose of explaining. This is not allowing parol evidence for the purpose of varying or altering the contract, or of putting a different sense and construction upon its language from that which it would naturally bear, but for the purpose of showing the circumstances under which the language was used, and applying it according to the intention of the parties. 'The true interpretation of every instrument being manifestly that which will make the instrument speak the intention of the party at the time it was made, it has always been considered an exception, or perhaps a corollary, to the general rule above stated, that when any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself.' (*Sandford* v. *Newmark etc. R. R. Co.*, 37 N. J. L. 1, 3.) For the purpose of determining what the parties intended by the language used, it is competent to show not only the circumstances under which the contract was made, but also to prove that the parties intended and understood the language in the sense contended for; and for that purpose the conversation between, and declarations of, the parties during the negotiations at and before the time of the execution of the contract may be shown. (Code Civ. Proc., secs. 1860, 1861; *Atlanta* v. *Schmeltzer*, 83 Ga. 609 [10 S. E. 543]; *Keller* v. *Webb*, 125 Mass. 88 [28 Am. Rep. 209]; *Long* v. *Long*, 44 Mo. App. 141; *Swett* v. *Shumway*, 102 Mass. 365 [3 Am. Rep. 471].)

"In our judgment, the contracts in question are so far ambiguous, in the particular under consideration, as to fall within the principles here announced; and we think that the excluded evidence was of a character admissible to explain and fix the intention of the parties in the employment of the language used. It may be that, standing alone, the contracts would receive the construction urged by defendant. . . . But, at the same time, it is likewise, we think, perfectly susceptible of the construction contended for by plaintiff, if such was the meaning intended by the parties, and that without doing violence to the ordinary sense or meaning of the language employed, or importing any new term into the contract. Nor does such construction make the contract

appear so unreasonable or improbable as to preclude it. In determining the meaning of the parties in the particular clause, we will look at every part of the instrument. 'It is a true and important rule of construction that the sense and meaning of the parties to any particular instrument should be collected *ex antecedentibus et consequentibus;* that is to say, every part of it should be brought into action, in order to collect from the whole one uniform and consistent sense, if that may be done.' (Broome's Legal Maxims, 442.) Applying this rule, and regarding the different provisions of the contract in the light of the circumstances surrounding the parties, as disclosed by the evidence, the construction sought to be established by plaintiff is neither unreasonable nor necessarily inconsistent with the general purpose intended to be accomplished. . . . '' (See, also, *Brewster* v. *Lathrop,* 15 Cal. 21; *Preble* v. *Abrahams,* 88 Cal. 245 [22 Am. St. Rep. 301, 26 Pac. 99].)

The evidence discloses that the parties had known each other for sixteen or seventeen years and the tenor of the letters received in evidence indicates the most intimate and friendly relations between them. The Tennants, who at that time lived in Hollister, had visited the Wildes in San Diego during the summer of 1922, at which time they had expressed a desire to move to San Diego. A letter written October 12, 1922, by Mr. Wilde to the Tennants contained this language:

''I might add that if Clarence (Mr. Tennant) would want to be sure of something when coming, that I have just bought and am having moved a forty room, 3 story, wooden hotel building, that we want to make up into housekeeping apartments, and *I would be glad to have him undertake this if he cares to and can.* . . . there ought to be carpenter work in about two weeks. This would give him an easy start here so he could get right to work and get his bearings, and there will probably be work for a month or so on this job; I would very much like to have him here to do it. Of course, I want you to be governed by your own wishes and best interests, but since the idea was suggested in your letter it occurred to me that this might be of some consequence to you as I must have some one anyway. Then I have bid on some government buildings here that I may get also, and if I do there will be a lot of carpenter work on

them that could be gone ahead with as soon as the other is finished. And all of this work is mostly inside work, that the weather would not interfere with. I have a nephew who just came this morning from Alabama that I expect to use for whatever he can do, altho he is not a carpenter or skilled in anything particularly, but he ought to work well with Clarence in whatever he could do. We will make it home-like for Clarence as best we can. If you think well and favorably of this I would be pleased to hear from you as soon as you can decide so that I may make my plans accordingly, although I do not want to hurry you or have you act other than with perfect freedom and deliberation and for what you consider to be your own best interests.

"Very sincerely,

"W. C. W."

To this letter Mrs. Tennant replied on October 24th. This letter is couched in the most friendly terms and in it Mrs. Tennant states that she has been "so anxious for Clarence to go down there and do Will's work," but that she thinks "he hates to make the break," and that she is "more than sorry to say that he hasn't sense enough to accept" but that perhaps later on he might desire to go to San Diego. On October 31st Mrs. Tennant again wrote to Mr. Wilde, saying "I wonder if we are too late or if the job is still open for Clarence." This letter refers to a friend of Mr. Tennant's, a man named Shade, stating that Mr. Tennant wanted to know if Mr. Wilde had had anyone yet to do his work, that Mr. Shade was a "good finisher" and that Mr. Tennant wanted to know if Mr. Wilde could use both Shade and himself. The response to this letter was a telegram sent by Mr. Wilde to Mrs. Tennant, which is as follows:

"All work I wrote you about is still open excepting hotel building foundation which I have contracted for and is now being installed. If Clarence can vouch for Shade he could come too. There ought to be over months work for both. Carpenters scale is eight dollars. Am writing. Wait.

"W. C. WILDE."

The date of this telegram was November 2, 1922, and it was followed up by a letter written by Mr. Wilde to both Mr.

and Mrs. Tennant on November 4, 1922. This letter is as follows:

"Mr. and Mrs. Clarence Tennant,
"90 Hawkins St.,
"Hollister, Calif.

"Dear Friends:—Upon receipt of Mrs. Tennant's letter of the 31st ult. I sent Western Union night letter telegram, of which copy is enclosed. After our previous correspondence resulting in your decision not to come here at this time, I, of course, abandoned the idea and based my plans on other considerations, and when I received your last letter the hotel building was landed on the lot and I had contracted for the foundation work and material. The main foundation work is now done and I am informed that it will be sufficiently set so that the building can be let down onto it about the 13th inst. Then the rough plumbing work has got to go in after that before the carpenter work could be undertaken and gone ahead with so as to make the best progress, especially if there were two men to go at it, and I do not want to have you and Mr. Shade here on my own suggestion or responsibility until the work is ready to go ahead with. That is the reason I telegraphed you as I did, so I could write and explain. I would not want you to lose any time or be delayed on my account, if I can possibly avoid it, and so am trying to figure safe. It took longer to get the hotel building on the ground than I figured it would when I wrote you on the 12th ult. Of course, if you and Mr. Shade want to come anyway at once it will be all right with me and I will let you go ahead just as fast as things can be arranged; so long as you know the situation there can be no disappointments. Otherwise I will telegraph you so you can be here when I am sure the work can immediately be gone ahead with and continued right along without your losing any time except for unforeseen things. Of course, if I had known you were going to be able to come as you now are, I would have saved the foundation work for you and let you be doing that now, but I did not know. So the next best I can do is to let you take things up as soon as the building is on the foundation. I want to be understood right, that it is my sincere desire to have you do the work now just as it was when I wrote you before, but am simply not sure that if you came at once I could put you right to work and keep you

going every day, especially two men; however, as I have before stated, when you know this and if then you are willing to come and take the chances with me as to just how much we may have to wait for the completion of the foundation work and getting the building onto it, and possibly for some of the rough plumbing, then you can come as fast as you like.

"I also mentioned to you about some government buildings here that I had bid on, and that if I got these they would have to be moved and have work done on them. These bids are to be decided upon and awarded at Washington, D. C., by the War Department, and Congressman Swing of this district, who is in Washington now, is working on the matter for me at that end; he wrote me on the 27th ult. that he had just talked with the officer in charge of these bids and that from his analysis of them he intended to recommend the acceptance of the bids in the way that will result in my bids being accepted, and it then remained as to whether this officer's recommendation was followed by his superior officers in making the awards. I may hear any time now as to this matter, and when I do and if I should get the buildings I have bids on, I will have this much more on my hands for immediate attention, because they have to be moved off the ground right away.

"So you see I will soon be in a position with this hotel building, and may also be with these government buildings if I get them, when I could not only use you and Shade to very good advantage regularly for probably about three months, but, further than that, it would be a great benefit and relief to me *to have someone that I could rely upon to undertake and go ahead with this work and not to have to give it such constant careful attention myself.*

"Although, as I previously wrote, it is for you to consider the matter entirely from the standpoint of your best interests and be governed accordingly, and since you know my position and wishes, if, considering everything you want to come right away it is all right with me, or if you would rather wait and have me let you know about developments as fast as they occur I will do that, or if you think it better for you to give up the idea entirely in view of the circumstances, you feel perfectly free to do that. Just let me know so I can plan accordingly, for there are people after me to figure on these things but I am holding off on everything

for the present. If you want to come now, just let me know
and start; if you want more information let me know; if
you want me to let you know when things are definitely
ready to continue with I will do that. But, in any event,
let me know.

"Of course, I am not saying that they could not get other
work here to take up and fill in on any spare time they might
have now or any time.

"We are all well, and, needless to say, very busy with
what we have on our hands, and the coming of my nephew
and niece from Alabama is helping us out a great deal, con-
sidering they are both young and inexperienced.

"Hoping this finds all of you in the best of good health,
and that Clarence's absence will not prove to be too hard on
the rest of you (if he should come), although he could go
back and forth once a month easy enough, and awaiting
your advice as what your wishes are, I am,

"Very sincerely."

(Italics ours.)

Mrs. Tennant replied to this letter within the next few
days to the effect that Mr. Tennant and Mr. Shade would
be ready to start Mr. Wilde's work on three days' notice.
On November 20th Mr. Wilde wrote to the Tennants stating
the general nature of the carpenter work in connection
with the alteration of the hotel building. In this letter
Mr. Wilde refers to a figure which he had received from
a San Diego firm of contractors, stating: "At first I had
planned on letting the labor and material complete by con-
tract, and so I now have a figure for doing it accordingly.
But I would like to have Clarence and Mr. Shade do the
work if they can, and in order that they would be sure of
themselves either way I would like to have them come and
go over the plans and the work to see if they felt satisfied
that they could undertake it and *could also keep within
the contract figure that I have,* which I think is high
enough, and then if they felt they could not safely assure
me of that I could let it by contract and in the contract
would make a condition that they be employed by the con-
tractor. In these ways they would be as sure as possible
of working after they got here, and, of course, hope they
will feel equal to *undertaking it by themselves and hiring*

*such other help as they can use to advantage or need.*"
(Italics ours.)

This letter also emphasizes the necessity of speedy completion of the hotel building in order to get it ready for the winter season. He also says: "It will take them a few days *to go over things and figure them* and get their bearings so as to start work to the best advantage. . . . *This may be a change for Mr. Tennant to test himself for independent work and thereby find his way to figure for himself.*" (Italics ours.)

The figure for doing the work which Mr. Wilde refers to in this letter was submitted by the firm of Garner & Knight, the net amount being $3,000. On November 20th Mr. Tennant telegraphed to Mr. Wilde, "Are you ready for us? Shade I anxious. Answer." This telegram was evidently written before the receipt of the letter last referred to and on the same day Mr. Tennant telegraphed to Mr. Wilde, "Will see you Sunday P. M." Mr. Tennant, accompanied by his friend Mr. Shade, reached San Diego Sunday, November 22, 1922, and during the course of the conversation which Mr. Wilde had on that day with Mr. Tennant and Mr. Shade, he told Mr. Tennant of the written proposal which he had received from Garner & Knight and that he had to have some kind of a contract with reference to the construction work and that if Mr. Tennant and Mr. Shade wanted to make a contract with reference thereto he would like to have them do it. Mr. Shade expressed himself as not wishing to undertake the matter on a contract basis. Mr. Tennant expressed his desire to stay, but did not want to do so unless Mr. Shade also stayed. Mr. Wilde then told Mr. Tennant that he would like to have the matter arranged so that he could let the contract to Garner & Knight and let Mr. Tennant work for that firm. Mr. Tennant, however, did not agree to this. Mr. Wilde testified that he said: "The only way in which it could be arranged if he did not want for me to let the contract to Garner & Knight and in that contract to procure his employment was to have some definite contract with him as to the cost of this work." Mr. Tennant replied to this that he would rather stay and undertake the work with himself and Mr. Shade even though he lost on it, than to leave San Diego. Further testimony of Mr. Wilde along

this line was as follows: "I told him that I felt satisfied that the figure of Garner & Knight was a safe figure, that these men were men who were experienced in doing this class of work locally, they knew the local labor and material conditions, they were men who had operated here and lived here for some time, I had known them for some time, I knew of remodeling building work that they had done, and while I had no way of knowing details of the cost involved in figuring a job of this kind, that I felt their estimate of it was a safe, reliable estimate, and I was willing to let him undertake it on their exact figure if he wanted to do so; and his employment was the result of it, and the making of the contract was the result of this correspondence and these conversations." Shortly after this conversation the contract in question was signed and Mr. Tennant went to work and received $8 a day, Mr. Shade receiving $10 a day. Mr. Tennant kept track of the labor until it amounted to over $1,800 and then quit.

The specifications referred to in the contract between Mr. Tennant and Mr. Wilde and which were the same specifications that accompanied the bid of Garner & Knight are set forth at page 5 of the reporter's transcript. It is unnecessary to quote them in full, but certain of their provisions read in connection with the contract of which they are made a part by reference, throw additional light upon the intention of the parties. They are as follows:

"Specifications of the work and materials necessary in doing the carpenter work in remodeling building at 1451 State street for W. C. Wilde:

"Carpenter work. All work under this head to be performed in the best workmanlike manner. *Contractor to furnish all labor* in tearing out partitions and cutting openings in accordance with plans, and *furnish all material and labor* in putting in new partitions, which is shown on drawings, to furnish all doors and windows and other materials necessary to carry out full details of drawings, *Contractor* to be allowed to use all doors and windows and other materials which have been torn out, that are in good condition. . . .

"Front Porch. *Contractor* to furnish all labor and material and build front porch according to plans." (Italics ours.)

The work actually cost $1,106.85 more than the $3,000 referred to in the contract. During the progress of the work the labor accounts were kept by Mr. Shade, who reported the same to Mr. Wilde, by whom they were paid out, the common labor being employed by either Mr. Shade or Mr. Tennant. The material was bought and paid for by Mr. Wilde on the orders of Mr. Tennant or Mr. Shade, the orders being made out by one of these gentlemen and given to Mr. Wilde, who would place them with the materialmen. Sometimes Mr. Wilde would select a place where the material was to be bought and sometimes Mr. Shade and Mr. Tennant went around to the various materialmen examining the material and prices in order to get an idea as to price and quality. The bills were all rendered to Mr. Wilde.

From the foregoing testimony, which went in without objection and which was not in any way contradicted by respondents, it seems evident that what the parties had in contemplation was that Mr. Tennant should be responsible for the carpenter work upon the building, guaranteeing that its cost would not exceed the amount of the bid submitted by Garner & Knight, and that it was not in the contemplation of the parties that Mr. Tennant should merely be employed as a journeyman carpenter. This is made evident not only from the correspondence of the parties antedating the actual contract but from the construction placed upon it by the acts of the parties themselves. Not only did Mr. Tennant employ Mr. Shade as his superintendent, but he also employed the other labor in connection with the carpenter work and co-operated with Mr. Wilde in picking out and purchasing the material.

It is, of course, a familiar rule that the actions of parties to a contract subsequent to its execution and with relation thereto may be looked to as an aid to its construction when the language of the instrument itself is ambiguous. Indeed, it has been said in such a case that the actions of the parties afford one of the most reliable means of arriving at their intention. (*Ghirardelli & Co.* v. *Students' Express & Transfer Co.,* 175 Cal. 427 [166 Pac. 16]; *Woodard* v. *Glenwood Lumber Co.,* 171 Cal. 513 [153 Pac. 951]; *Grant* v. *Bannister,* 160 Cal. 774 [118 Pac. 253]; 6 Cal. Jur. (Contracts), sec. 184, and cases therein

cited.) The law recognizes the practical construction of a contract made by the parties thereto as the best evidence of what they intended (*Boardman Co.* v. *Petch*, 186 Cal. 476 [199 Pac. 1047]; *Union Oil Co.* v. *Stewart*, 158 Cal. 149 [Ann. Cas. 1912A, 567, 110 Pac. 313]), and in this connection and in addition to the acts of the parties, above referred to, it is not without significance that both parties in their verified pleadings set up almost identical constructions of the contract in issue. (Amendment to Complaint, Cl. Tr., p. 16; Answer and Set-off, Cl. Tr., p. 5.) In plaintiffs' pleading, first above referred to, the plaintiffs thus construe the contract: "That on or about the 28th day of November, 1922, said plaintiff, Clarence S. Tennant, made and entered into a contract in writing with said defendant, W. C. Wilde, whereby said Tennant undertook and agreed for the sum of three thousand ($3,000) dollars, to supply materials and labor for certain work on the Court Hotel Building. . . . " ▮ The pleader is bound by the interpretation adopted by him and set forth in his pleading. (*Silvers* v. *Grossman*, 183 Cal. 696 [192 Pac. 534].)

▮ In support of the contention that the agreement is invalid and unenforceable for lack of mutuality and want of consideration it is suggested that it afforded Tennant no control whatever over the cost of material and labor and that Wilde might have hired any number of workmen and purchased any amount of material at his own option, hence that it was in effect a unilateral agreement by Tennant, imposing no obligations upon Wilde. Under the construction we have placed upon the contract and under the construction the parties themselves appear to have given it, this theory must fall to the ground. Considerations, similar in import to the one in question, have been frequently upheld as against the contention that they lacked mutuality and consideration. Thus, in *Scott* v. *Stevenson Co.*, 130 Minn. 151 [153 N. W. 316], a manufacturer had agreed to furnish a dealer with such fur goods as the dealer should need during the following winter season, no amount being specified. It was held that the contract was not void for indefiniteness, uncertainty or want of mutuality. It was further held that parol evidence was admissible to show the understanding of the parties and the circumstances under

which the agreement was made, and that a part performance was sufficient to remove any defect of mutuality or consideration if any such had existed. In *Young Co.* v. *Springer*, 113 Minn. 382 [129 N. W. 773], the same defects were urged as against a construction contract. The contract in question consisted of a request by the general contractor for a written proposal and a letter replying thereto in which the subcontractor stated: "I will furnish and lay the tile in the Y. M. C. A. building as per plans and specifications for $894.00, for all vit (meaning vitreous tile) cut out, deduct at 45 cents per square foot." It was held that this offer and acceptance constituted a binding contract and that it was not material that changes in the plans of the building were contemplated which might reduce defendant's proposal to such an extent as to leave no work for him to perform. The court said: "The consideration necessary to support the contract is found in the offer of defendant to do the work and plaintiff's acceptance of the same." In *Rosenthal* v. *Empire Brick & Supply Co.*, 123 App. Div. 503 [108 N. Y. Supp. 347], the validity of a contract was sustained whereby the seller agreed to furnish the buyer all the mason's materials required for the construction of certain houses. It was held that the buyer was bound to receive and the seller to deliver and that the obligation was mutual. In *Walker Mfg. Co.* v. *Swift & Co.*, 200 Fed. 529 [43 L. R. A. (N. S.) 730], the agreement was to furnish from 175,000 to 225,000 pounds of meat during a certain period of time, followed by the provision: "We take care of buyer's needs this year." It was held that the agreement imposed upon the seller the duty of furnishing the ordinary needs of the buyer in his line of business for the period of time covered by the contract even though the amount stated therein should be exceeded and that the objection of lack of mutuality did not apply. In *Laclede Const. Co.* v. *Moss Tie Co.*, 185 Mo. 25 [84 S. W. 76], the contract consisted of a letter proposing to furnish all the railroad ties which the buyer might need, to the number of one million or less, at a certain price, the buyer accepting the proposition by letter. It was held that this contract was mutual. In this case parol evidence of the surrounding facts and circumstances was admitted to show the purpose, meaning and intent

of the contract. A similar case is that of *National Furnace Co.* v. *Keystone Mfg. Co.*, 110 Ill. 427, sustaining the validity of a contract for the sale of all the pig iron which the buyer and manufacturer should need in its business during a designated period of time. (See *Campfield* v. *Sauer*, 164 Fed. 833; *Loudenbach Fertilizer Co.* v. *Tennessee Phosphate Co.*, 121 Fed. 298 [61 L. R. A. 402]; *Lima Locomotive Works* v. *National Steel Co.*, 155 Fed. 77 [11 L. R. A. (N. S.) 713]; *Dailey Co.* v. *Clark Can Co.*, 128 Mich. 591 [87 N. W. 761]; *Cooper* v. *Lansing Wheel Co.*, 94 Mich. 272 [34 Am. St. Rep. 341, 54 N. W. 39].) In *Smith* v. *Morse,* 20 La. Ann. 220, the court upheld the validity of a contract by the terms of which an ice manufacturing company was to furnish a hotel company with all the ice it would use in the hotels maintained by it for a certain period of time. The court said, as to the want of mutuality: "This involved the legal proposition that there can be no contract where only one of the parties to it is bound; but it has no application here unless it be supposed that the contract contemplated that it was optional with Morse & Co. to dispense entirely with the use of ice in their large hotels, which is not sanctioned by any reasonable construction that can be placed upon the contract."

We think the trial court was in error in excluding the contract from the consideration of the jury, for which reason it will be necessary to reverse the judgment. Inasmuch, however, as all of the issues, other than those tendered by appellants' counterclaim and set-off, were settled by the judgment in the court below and no objection has been made to that judgment, except with respect to the exclusion from the jury of the evidence tendered in support of the set-off and counterclaim, it will not be necessary upon a retrial of the case for any issues to be considered other than those raised by the second defense and counterclaim.

The judgment is reversed, with directions to the court below to permit the introduction into evidence of the contract and specifications in question and of testimony pertinent and material to the issues tendered by defendants' second defense and counterclaim.

Works, P. J., and Thompson (Ira F.), J., concurred.