[L. A. No. 14522.   In Bank.—March 30, 1934.]

J. E. KING, Respondent, v. J. EARLTON MOORE et al., Appellants.

Dockweiler & Dockweiler & Finch and Walter R. Leeds for Appellants.

Kaye & Johnstone, Homer Johnstone and W. W. Kaye for Respondent.

THE COURT.—A hearing was granted in this case after decision by the District Court of Appeal, Second Appellate District, Division Two. We hereby adopt the following statement of facts and review of the evidence by Mr. Justice *pro tem.* Archbald as part of the opinion of this court:

"Appeal by defendants from a judgment against them for one-half of certain commissions and profits earned by them in effecting certain sales of real estate.

"The amended complaint alleges substantially that on or about the 15th day of September, 1928, defendants as real estate brokers entered into an agreement with plaintiff to pay him one-half 'of the gross commission, compensa-

tion or profits' which they might receive from sales made of properties then held by them or which might thereafter be held by them for sale to 'anyone interested' by plaintiff therein or to whom plaintiff 'would introduce' them. The pleading contains three counts. The first alleges the sale of the estate of 'Frances Marion, widow of Fred Thomson, deceased', on or about April 2, 1929, to 'a prospective purchaser' whom the plaintiff, 'relying on his said agreement with defendants, had theretofore procured or caused to be introduced to the said defendants', on which sale the latter received a total commission of $38,000. The second count alleges a similar sale on April 20, 1929, of property held by defendants on an option procured from Frank Muller and Walter Muller on or about April 4, 1929, on which sale a profit of $15,000 was made. The third count alleges a third sale on or about August 1, 1929, of property known as the 'Charles Ray' residence, upon which sale defendants earned as commission and profit $3,500. The jury returned a verdict for $24,082.50 in favor of plaintiff. Defendants' motion for a new trial was denied as to the first two counts, but granted as to the third, the judgment thereupon rendered being reduced by $1,750, the amount of the verdict on such count. The appeal is from the judgment as so modified.

"The evidence shows that the sale involved in the first count was made by defendant Harley Moore to one L. S. Barnes, and in the second count by said defendant through said Barnes to the Elbe Oil Company, of which Mr. Barnes was secretary-treasurer and general manager. Plaintiff testified that he met Harley Moore in 1926 when said defendant and his mother inspected the Casa del Mar Club, which was then about completed and where plaintiff was working at the time; that shortly after such meeting Harley Moore and his mother invited plaintiff to visit them at their home, which he did; that thereafter plaintiff saw said defendant four or five times, until in 1928, when Harley Moore and his father, the defendant J. Earlton Moore, visited the 'Times home' in Mira Mar Estates, where plaintiff was employed by the Mira Mar Sales Corporation, at which time he was introduced by Harley Moore to J. Earlton Moore, and that he invited them to lunch. After that, according to plaintiff's testimony, he paid two or three visits to the offices of defendants in Beverly Hills, and

that in the 'forepart of September' on one of such visits Harley Moore asked 'if I didn't have quite a lot of wealthy clients that would be interested in Beverly Hills property . . . and he said if I had anyone he would . . . give me 50 per cent of . . . his gross commission on any sales that might be consummated through their firm. . . . I didn't mention any of the names until we had agreed upon a plan of commission. The plan was that if I would make the introduction to Harley Moore, that they would agree to give me one-half of the gross commissions on all sales made. I agreed to the proposition after I had asked him if we could have a little memorandum . . . to that effect so that I would be protected by an agreement. He says, ''Well, we don't usually do that. . . . We would rather put your name right in the escrow along with ours in case anything is done, and you will be paid direct from escrow and the bank will handle the money and . . . you will be positively protected that way.'' ' He testified further that 'J. Earlton Moore, who was at his desk, turning, said, ''Yes, that is the best way to do it; that is the way we would prefer to do it.'' '

''Plaintiff then testified that 'he told the above-named defendants the next day of Alfred F. Smith, who was living at the Beverly Hills Hotel, and made an appointment to go with Harley Moore to the hotel to meet Mr. Smith that afternoon. There is quite a sharp conflict in the evidence not only as to the agreement to share commissions, testified to by plaintiff, but also as to the purpose of the visit to Mr. and Mrs. Smith. According to plaintiff's testimony, the Smiths 'were going to buy a place' and were shown a house by Harley Moore at the corner of Bedford drive and Sunset boulevard that defendants had for sale. Mr. Smith testified that he had just come to Beverly Hills and was temporarily residing at the Beverly Hills Hotel, and that plaintiff called on him with a Mr. Cottrell (another realtor); that he had never seen either of them before; that there was no discussion of the sale of a house to him, but that he wanted to rent a house; that plaintiff and Cottrell showed the Smiths several places for rent, as did other realtors; that plaintiff brought Harley Moore out and introduced him, and that they looked at the house at Bedford and Sunset as a rental proposition; that nothing was said

about purchasing it—'We were not in the market to purchase.' Mr. Smith's testimony is corroborated by that of Harley Moore. He further testified that he rented the Lita Gray Chaplin place from another realtor for one year and lived in it 'for nearly a year and a half'; that he played golf with Harley Moore beginning in the spring of 1929, and that through the efforts of Mr. Moore he purchased the Charles Ray place, but that Mrs. Smith was the one who first spoke to Mr. Moore about buying the property, and 'the first I knew of it she had looked at it before I had ever been there'.

"About a week after he introduced Harley Moore to Mr. Smith plaintiff met the former in his office and 'told him that I knew a family by the name of Barnes in Beverly Hills and asked him if he knew them. He said no, he did not; didn't know where they lived. I told him that I had known Gloria Barnes, the daughter, quite well, and had met Mr. and Mrs. Barnes on one occasion. Q. Was anything said with reference to whether they were looking for property? A. Yes there was. I told him that Gloria had told me during the summer that they bought an estate in Beverly Hills, that Mr. Barnes was a real estate buyer and was looking for investments and I should meet him. She said that anything that she and her mother would select would be satisfactory to Mr. Barnes. Gloria Barnes was quite a horsewoman and was looking for a place where they could have stables for their horses. . . . On that occasion I discussed Miss Roma Seger . . . an unmarried woman,' who with her mother lived in Beverly Hills, and 'I discussed Miss Rita Seevers' and 'Miss LePelletier', who were afterwards introduced by plaintiff to Harley Moore. Plaintiff further testified that on that occasion he told Harley Moore, 'I thought the best method of approach, meeting the family, would be through the door—they would go horseback riding. He agreed that would be the best plan'; that 'the last part of September or probably the first part of October . . . 1928 . . . we [Harley Moore and plaintiff] had been out to the beach and upon arriving at his office in Beverly Hills he suggested that I get Miss Barnes on the telephone and arrange a meeting that evening at a picture show, or something, in order to get acquainted. I called her on the telephone. She was out of town at the time.' The

454

evidence shows that Harley Moore did call Miss Barnes on the telephone and met her about ten days after the conversation above mentioned with plaintiff; that he was introduced by the daughter to Mr. and Mrs. Barnes in October or November of 1928, leaving the house with the daughter immediately afterwards for a horseback ride; that after the death of Fred Thomson on 'Christmas day, 1929,' defendants obtained a listing of the estate; that Gloria Barnes, reading that the Thomson horses were to be sold, visited the place to see them and saw the stables; that her mother had been planning a home to be built on property which Mr. Barnes had purchased for that purpose some time before, and as Gloria thought the plan of the Thomson stables good, she went with her mother to visit them in February of 1929; that Harley Moore visited the Ambassador horse show with Miss Barnes during the week of February 16, and that she then told him that 'they were going to build a new home across from Doheney's in Beverly Hills, and she was going to have stables there and keep her horses there; and she said she had been up [to the Frances Marion Thomson property] and inspected the stables, or bought a horse from Mrs. Frances Marion Thomson, and that they had fine stables up there; and I told her at that time that I had the place for sale.' Harley Moore further testified that about a week after the horse show he asked Miss Barnes if she thought her father 'would consider buying the Thomson property instead of building a home, and she said she was quite sure he would not; that they had their plans all drawn and her mother had been working on them for a couple of years, and she didn't think she would be interested'. Moore evidently spoke to Mrs. Barnes the next time he saw her, and 'Mrs. Barnes told me she had already seen the property but had never been inside of the house. . . . I told her we had it for sale and would she like to look through the house. She said yes, and I took Mrs. Barnes and Miss Gloria Barnes up and showed them through the house . . . ; that was in March, 1929.' The evidence shows that thereafter 'either Mr. or Mrs. Barnes' phoned Harley Moore one Sunday morning and asked him to take them to see the Thomson house, which he did; that a few days later Mr. Barnes asked him to come and see him, and that when he did so Mr. Barnes made an offer for the Thomson property. This was refused by Mrs. Thomson, and

Mr. Barnes made 'a further offer of more money', which was taken to Mrs. Thomson, who accepted 'after three or four days . . . , about the first of April, 1929'.

"With regard to the second sale, Harley Moore testified that two or three days after the deal for the Thomson property went into escrow 'we were speaking about real estate in general, and I told him [Mr. Barnes] that I had an option on what I considered the finest corner in . . . the Beverly Hills section, and that I would very much like to show it to him, that he might be interested in its purchase', and that about two weeks later Mr. Barnes purchased said property.

"It is apparent from the evidence that plaintiff was introduced to Mr. and Mrs. Barnes, but that such introduction did not register with them, as neither had any recollection of meeting plaintiff until after the Thomson property was purchased, when he came to inquire if they had bought it. Mr. Barnes testified, and he is corroborated by his wife and daughter, that neither of the latter said anything to him about purchasing the property, but that they told him about the riding rings and stable· and 'wanted I should see them so they could put something similar' on the property he had bought to build on; that he went with Mrs. Barnes to look the place over; that 'about a week or ten days afterwards I got to thinking about it and I suggested to Mrs. Barnes that we might not build; that there was shrubbery on this other place and we might buy the place and sell the other'; that 'there were two or three conversations about it, and I finally sent for Mr. Harley Moore and made an offer on the place, which was rejected. Some time later he told me that he thought that we could buy the place at a price that I was agreeable to pay.'

"Harley Moore testified that plaintiff told him about Mr. Smith desiring to rent a 'large house with four or five master bedrooms' and asked if he had any that might please him, 'and I told him that I had'; that plaintiff then said he would like to introduce Mr. Smith to him, and asked 'if we were successful in renting Mr. Smith a house, would I split the commission with him, I told him I would'; that at no time did he ever tell plaintiff he would give him one-half of the gross commission, compensation or profits that he might make from a sale of properties then held or which

might thereafter be held by his firm to anyone produced or introduced by plaintiff.

"As to the episode related by plaintiff with respect to the Barnes family, said defendant testified: 'That was on the day that Mr. King . . . was trying to sell me a lot in the. Bel Air Club . . . and I went down to look at it with him. We came back to Beverly Hills and I took Mr. King to dinner . . . and went back to our office and sat down . . . about 8:30 in the evening. I asked Mr. King if he wanted to go out and play a little bridge somewhere, and he said, "Well, let us get a couple of girls and go to a picture show." I said, "Well, we will have to get someone in Beverly Hills. It is about time for the second show." He asked me if I knew any girls in Beverly Hills, and I told him I didn't know any that I could call up just at that hour; that most of my girl friends lived in Los Angeles or Hollywood; and he said he knew a young lady in Beverly Hills who had not lived there very long and was a neighbor of mine, and . . . he said her name was Miss Gloria Barnes, and she was a fine horsewoman, and that I rode horseback some,. and that probably it would be a good thing if we were acquainted with each other; . . . I said "all right, call her up." And he called the Barnes home and Miss Barnes was not there; . . . Mr. King said to me that he would like to have me know Miss Barnes . . . and that he would give me his card with her name, phone number and address on it,' and some time at my leisure I might call her up and say to her that I was a friend of his and that way I might meet her.' "

The foregoing review of the pleadings and testimony demonstrates that the jury's verdict is supported by substantial evidence, and that the judgment should be sustained unless serious error is shown. Defendants strenuously contend that prejudicial error was committed by the trial court in the reception of certain testimony, and that this alleged error is ground for reversal of the judgment.

The testimony referred to is that of Miss LePelletier, Miss Seevers and Miss Seger, each of whom testified over objection that plaintiff introduced them to defendant Harley Moore on "a business transaction". It appears that defendants did not sell these witnesses any property, and that in fact they were principally interested, at the time, in

selling their own property, rather than in purchasing property through defendants. Defendants make the point that the fact that these three women listed their properties for sale could not be probative on the issue of an agreement to divide commissions on property purchased.

Preliminarily, we deem it proper to state that in a record such as that before us, with substantial evidence to support the plaintiff's claim, it is not easy to characterize this evidence as seriously prejudicial, even if improper. The contention is that it was irrelevant, but while collateral matters not connected with the issues should be excluded, prejudicial error from their admission should reasonably appear, and we doubt whether the confusion of the jury in this case was as great as appellants maintain.

But in fact the evidence was admissible. Plaintiff testified to an oral agreement by which he was to introduce defendants to wealthy "clients" and "prospects", and defendants were to do the work of selling, and divide commissions with plaintiff. Plaintiff's duty was solely to make the contacts or introductions. Plaintiff was permitted to testify without objection that on the occasion of arriving at this agreement, they discussed the names of several prospects, that is, the details of plaintiff's anticipated performance, and at this conversation plaintiff and defendant discussed the names of the Barnes family, Miss Seger, Miss Seevers and Miss LePelletier. Any evidence showing that plaintiff brought these very people in contact with defendants tends to corroborate the fact of the *agreement* itself, which was in dispute. The rule that acts of the parties subsequent to an agreement may be competent evidence of its terms is well settled. (*Tennant* v. *Wilde*, 98 Cal. App. 437 [277 Pac. 137].) See, also, as to the admissibility of the testimony in question, *Moody* v. *Peirano*, 4 Cal. App. 411 [88 Pac. 380]; *Lobree* v. *White Lumber Co.*, 53 Cal. App. 85 [199 Pac. 821].

Moreover, it appears from the testimony of one of these witnesses, Miss Seger, that she was a future prospect. On cross-examination by counsel for defendants, as to whether there was any understanding between herself and plaintiff that upon sale of her property she might buy, she testified: "I said I might be interested . . . but would not be further interested until I would dispose of the Beverly Hills house."

Finally, it appears that the very evidence objected to—the fact that these three women were introduced by plaintiff to defendant and were interested in selling their property—was also given by defendant Harley Moore, who, under examination of his own counsel, recited the same matters, that is, that plaintiff introduced him to these women and that they listed property with defendants for sale.

The record shows, therefore, that the introduction to these three women was part of the agreement as related in plaintiff's testimony; that their names and the facts concerning the transactions had with them were given in evidence both by plaintiff and defendants, without objection; and that one of them was interested in purchasing property in the future. It seems to us that their testimony tended to corroborate the essential fact of the agreement, and though subject to different inferences, was admissible. In any event, the jury, having before them their names and the very facts to which they testified, could not have been prejudiced by their direct testimony.

We find no reversible error. The judgment is affirmed.