[Crim. No. 5622.   First Dist., Div. Two.   Apr. 14, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS DEAN SCAHILL, Defendant and Appellant.

110

W. O. Weissich for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendant Thomas Scahill appeals from an order granting probation entered after jury trial of a violation of section 548 of the Penal Code (disposing of property insured against loss by theft with intent to defraud the insurer). Imposition of sentence was suspended and defendant was placed on probation for a period of three years upon the condition that he serve six months in the county jail and pay a fine of $150.

In February 1965, Gregory Lamb was the owner of a 1965 Chevelle Super Sport which was equipped with a Muncie four-speed transmission, a stereo device and a ram manifold. Defendant Scahill informed him that one Bob Guelfi wanted to buy a ram manifold and arranged for the three of them to meet at the College of Marin on Thursday, February 25. During the course of this meeting, defendant told Lamb that he needed a four-speed transmission and asked Lamb the name of his insurance company and whether he had ever made a claim. Lamb gave him the name of his insurer and said that he had never made a claim. Defendant then asked if Lamb and he could arrange a deal to park Lamb's car so that he could remove the transmission, ram manifold and stereo. Defendant stated that he would keep the transmission and Lamb could have the manifold and stereo. Lamb agreed to this plan, and it was decided that he would leave his car in a parking lot opposite the San Anselmo Theater on the following evening, with an extra key therein. Defendant would then take the car and remove the desired equipment.

Lamb "chickened out" and did not follow through with the plan.

On the next day, February 27, defendant and Lamb met at defendant's home, arriving there at 11:15 a.m., just as defendant and one Steve Balzan drove up. Defendant and Lamb got out of their cars and defendant stated that he needed the transmission that day. Although Lamb initially indicated that he was not sure he wanted to go ahead with the plan, he

ultimately acquiesced. Defendant was to take and keep the transmission and to remove the manifold and stereo for Lamb, who would then file his claim with his insurance company for all of the equipment taken from the car. Thereafter Lamb gave defendant a duplicate key to his car and then drove the car to White's Hill in San Rafael, where he parked and locked it. Defendant and his two companions had followed Lamb in Balzan's car. Lamb then got into Balzan's car and was driven to defendant's home, where defendant and West got out. Lamb and Balzan then drove to Oakland to have a stereo device installed in Balzan's car.

Lamb and Balzan returned from Oakland at approximately 3:30 p.m. and immediately drove to the Drake High School parking lot, since it had previously been agreed that if the car was not there, Lamb was to return home and report it stolen. The car was not at the lot, and Lamb accordingly reported the theft to his father, accompanied him to the San Anselmo Police Department and filed a stolen car report.

On the afternoon of February 27, the car was observed by a deputy sheriff of Marin County parked beside the Petaluma-Point Reyes road, some 13 miles from White's Hill. The transmission, drive shaft, stereo, air cleaner, disengaging fan and some tapes for the stereo had been removed. There was no indication that the car had been forcibly broken into.

At 2 p.m. on the same day, defendant encountered one Philip Burns near the Fairfax bus depot and told Burns that he had a transmission in the trunk and that everything had gone well in connection with his taking the transmission. That evening, defendant encountered Lamb and Burns at a service station in San Rafael. Lamb asked if everything was all right, and defendant replied that everything had gone fine and that he had removed the transmission and left the car on a main thoroughfare where it could easily be found. Defendant stated that he had also taken the stereo and tapes and that Lamb could have the stereo back whenever he wanted it. Defendant said that it was not at his house but that he could get it whenever he wanted it.

Approximately a week later, Lamb heard defendant playing his automobile stereo and remarked that the tape sounded like one of his. Defendant laughed and replied, "It should."

On March 21, 1965, Lamb's automobile stereo was found by a police officer in the trunk of Michael West's car. Defendant, at that time, was a passenger in the car.

Defendant testifying on his own behalf, admitted that he had entered into an agreement with Lamb whereby defendant would remove the transmission from Lamb's car. He also admitted that he had asked Lamb if he was insured and if he had made any prior insurance claim. However, defendant stated that when Lamb told him that he was insured for theft, he (defendant) replied that it was of no concern to him, that he wanted the transmission and didn't care how he got it. He then agreed to "help Lamb out" and to go along with Lamb's suggestion that he remove the stereo as well as the transmission so that Lamb could report the theft of both items. Lamb was to get the stereo back and was to get the "difference" in money from the insurance company. On the afternoon of February 27, after Lamb had parked the car at White's Hill, defendant changed his mind about removing the equipment from the car and instead drove to San Francisco with Michael West, throwing the duplicate key away enroute. Defendant denied having made any incriminating verbal admissions to Lamb or Burns.

Michael West corroborated defendant's testimony to the effect that he had gone to San Francisco on the afternoon of February 27. He explained his possession of the stereo control unit found in his automobile trunk by stating that he had purchased it from an individual whom he met at a drive-in.

▉ Defendant first contends that the trial court erred in failing to sustain his challenge to the jury panel. The objection is based upon the fact that at the time the jurors' names for service in the instant case were drawn from the master box in the presiding judge's department, the drawing was done by the clerk without the presence of the presiding judge or any judge sitting in for him. Although it was then stipulated by both counsel that the drawing had in fact occurred without the presence of a judge, the court denied the challenge, stating that the procedural requirements of section 215, Code of Civil Procedure, were merely directory and there was no claim that the irregularity in question had deprived defendant of an impartial jury.

The basis of defendant's claim that the court's ruling was erroneous is that section 215 expressly requires that "the clerk . . . shall, *in the presence of the court,* proceed to draw the jurors from the 'trial jury box.' " (Italics supplied.) Defendant concedes that under section 1059 of the Penal Code, "A challenge to the panel can be founded only on a *material departure* from the forms prescribed in respect to the draw-

ing . . . of the jury . . . ." (Italics supplied.) However, he contends that the absence of a judge at the drawing clearly constituted such a material departure, since the statutory requirement that jury panels be drawn under judicial supervision is necessary to prevent a clerk or other court attaché from selecting in private a partial or biased jury.

Defendant has cited no California case directly in point but does rely strongly upon the Missouri case of *State* v. *Rouner* (1933) 333 Mo. 1236 [64 S.W.2d 916, 92 A.L.R. 1099]. In that case, the court did hold that noncompliance with requirements governing the drawing of the jury panel constituted prejudicial error requiring reversal. However, in that case, the deviations from the prescribed procedure were far more substantial than in the instant case and thus more likely to have deprived the appellant of his right to a fairly and impartially selected jury. Although Missouri law required the drawing to be conducted by the clerk, publicly, in the presence of the court and in open court, the clerk was not even present at the drawing, which was conducted by two judges who had retired from the courtroom to a separate, private room. The two judges testified that they had taken into this room three lists of names which they and one other judge had previously prepared. They then wrote each name on a separate slip of paper and, lacking an enclosed jury box of the type required by Missouri statute, placed the slips in an empty book carton which they found in the room. They then drew the jury panel from this box, which was uncovered so as to allow the names on the slips to remain visible during the drawing. The clerk and two subordinates testified that they had not seen a box of any kind in the room either before or after the drawing and similarly had not seen any list of eligible names nor any slips of paper on which these names had been written.

In the instant case, the jury panel was drawn by the clerk, who was the individual required by statute to perform this duty. Although it is true that he deviated from required procedure by conducting the drawing without the presence of the court, defendant has not contended, either here or in the court below, that this irregularity was intentional rather than inadvertent or that he did not conduct the drawing, in all other respects, precisely as required by law. Defendant similarly does not contend that the jury panel, from which the parties thereafter selected a jury, was not fairly and impartially selected or that precisely the same names would not have been

drawn had the clerk conducted the drawing in the presence of the court.

Under these circumstances, the procedural irregularity of which defendant complains is not of sufficient magnitude to justify the inference of prejudice arising from a factual situation such as that presented in the *Rouner* case. With the exception of the one deviation from required procedure, it must be presumed that the clerk regularly performed his duty. (Evid. Code, § 664.) Defendant has not demonstrated that the clerk was guilty of such a material departure from the required procedure as to affect defendant's substantial rights in securing an impartial jury. (*People* v. *Sowell* (1904) 145 Cal. 292, 296 [78 P. 717].) The court did not err in overruling this objection.

Defendant next contends that the evidence is insufficient to support the verdict because the record contains no direct testimony that Gregory Lamb's automobile was insured against loss by theft. Defendant concedes that Lamb did testify that *he told defendant* that his automobile was insured, but he asserts that such extrajudicial statements are obviously hearsay to the extent that they are relied upon as proof of the truth of the facts stated.

We find no merit in this argument. Defendant has overlooked the rule that where evidence is admissible for one purpose but not for another, it is incumbent upon a party to seek to restrict the use of such testimony, and his failure to do so renders the evidence admissible for all purposes. (*Wicktor* v. *County of Los Angeles* (1960) 177 Cal.App.2d 390, 405 [2 Cal.Rptr. 352]; *People* v. *Hawkins* (1960) 177 Cal.App.2d 714, 719 [2 Cal.Rptr. 524]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 700 [39 Cal.Rptr. 64].) Lamb's testimony that he told defendant that he was insured, gave him the name of his insurance company, and that he had never filed a claim, was obviously admissible for the purpose of proving that when defendant agreed to steal the equipment from Lamb's car, he did so with the intent to defraud or prejudice Lamb's insurer. Since defendant failed to request that the trial court instruct the jurors to consider Lamb's extrajudicial statements for this limited purpose only, said statements were also admissible to show the truth of their contents, and defendant may not now contend that the evidence is insufficient in that regard. The fairness of this rule is aptly demonstrated by the instant case, since it is apparent that if defendant had requested limiting

instructions, the prosecution could readily have corrected the alleged defect in its case merely by asking Lamb if he were in fact insured against theft.

██ Defendant next asserts that the trial court erred in admitting evidence of his oral admissions to Lamb and Burns in the absence of independent evidence proving the corpus delicti of the offense with which he was charged. He contends that the corpus delicti of the offense proscribed by section 548 of the Penal Code consists of the following elements: (1) the property in question was insured against theft; (2) the accused secreted, abandoned or disposed of the property; and (3) the accused acted with the specific intent to defraud the insurer. Defendant asserts that in the instant case, there was no evidence, independent of his oral admissions to Lamb and Burns, that the property taken from Lamb's car was insured against theft, that defendant intended to defraud Lamb's insurer or that he removed the property in question from Lamb's car. This argument is wholly fallacious. The sufficiency of the evidence bearing upon the existence of insurance against theft has been discussed above. Defendant's intent to defraud Lamb's insurer can clearly be inferred from his conversations with Lamb on February 25 and 27. The substance of these conversations and defendant's awareness of the existence of insurance coverage was established by his own testimony. Defendant's contention that he was not shown to have removed any property from Lamb's car is based upon his gratuitous assumption that the property could have been removed from the car by an unidentified third party who had knowledge of entering and "hot-wiring" locked cars. The uncontradicted evidence that defendant had agreed to remove the property from Lamb's car, that he knew where the car was parked and had been given a key, that the car showed no signs of having been broken into, and that defendant was thereafter in possession of a tape similar to one taken from the car and was also found in the company of an individual possessing an automobile stereo device similar to that taken from the car, establishes to our satisfaction that the jury could have come to no other conclusion than it did herein.

██ Defendant finally complains of certain instructions to the jury. He first asserts that since the case was one resting entirely upon circumstantial evidence, the trial court committed prejudicial error in failing to instruct that each essential fact in a chain of circumstances must be proved beyond a reasonable doubt. This contention is fully answered by the

many decisions of our appellate courts that failure to give this instruction is not prejudicial where the jury has properly been instructed relative to the doctrine of reasonable doubt, the law applicable where the evidence is susceptible of different constructions and the principle that circumstantial evidence of defendant's guilt must be inconsistent with any other rational hypothesis. (*People* v. *Watson* (1956) 46 Cal.2d 818, 831-832 [299 P.2d 243].) The trial court in the instant case gave each of these instructions.

Defendant complains of the fact that the court instructed the jury that ''The intent to defraud an insurance company may be found to exist if you find that the defendant intended by his acts, if any, to compel an insurer to pay money to them.'' Defendant contends that this instruction was obviously incomplete because it did not state that the defendant's acts must have been performed with the intent to *criminally* or *fraudulently* compel the insurer to pay money and it may thus have led the jury to believe that the presentation of any legitimate claim to an insurer would support a finding of intent to defraud the insurer. Defendant also suggests that the use of the phrase ''pay money to *them*'' may have confused the jurors and led them to wonder whether ''them'' referred to the insurance company or to appellant and another.

Defendant's contention that the challenged instruction dispenses with any need for the jury to find criminal or fraudulent intent cannot be sustained. The record in the instant case contains no evidence that any of the witnesses ever intended to submit a legitimate claim of any kind. Defendant himself admitted that he had entered into an agreement with Lamb whereby defendant was to remove certain equipment from Lamb's car and Lamb was to report this ''theft,'' to which he had expressly consented, to his insurer. Defendant's sole defense consisted of his assertion that he had changed his mind and had not performed his part of the plan. Under such circumstances, defendant could not conceivably have been prejudiced by the alleged incompleteness of the instruction. His objection to the use of the word ''them'' is similarly untenable. It is a matter of common knowledge that insurance companies do not pay claims to themselves.

Defendant finally objects to the court's instruction that ''If a man knows that the act he is about to commit will naturally or necessarily have the effect of defrauding another, and he voluntarily or intentionally does the act, he is charge-

able in law with intent to injure or defraud. It is not necessary that his object or purpose was primarily to defraud. It may have been to benefit himself.'' Defendant asserts that this instruction created a conclusive presumption of specific intent by using the words "chargeable in law with intent to injure or defraud,'' and thus withdrew the question of specific intent from the jury.

Defendant relies upon *People* v. *Snyder* (1940) 15 Cal.2d 706, 708-709 [104 P.2d 639], in support of his contention that the giving of the above-quoted instruction was error. However, in that case the defendant was charged with attempted murder, and the evidence bearing upon the existence of the required specific intent was conflicting, since defendant claimed that he had acted in self-defense. It was accordingly held that the trial court should not have withdrawn the issue of intent from the jurors by instructing them that a person is presumed to do that which he voluntarily does do and is presumed to intend the natural or probable consequences of his acts—in that case, the death of the victim.

In the instant case, unlike the *Snyder* case, the question of intent was never seriously in issue, since defendant virtually confessed that he had entered into an agreement to defraud Lamb's insurer and denied only that he had performed his side of the agreement. Under such circumstances, it is apparent that even in the absence of the instruction of which defendant complains, the jury, which impliedly found that he did remove the equipment from Lamb's car, could not conceivably have found that he did so without an intent to defraud or prejudice Lamb's insurer.

For the reasons above stated, the order granting defendant probation is affirmed and the purported appeal from the ''judgment'' is dismissed.

Agee, J., and Taylor, J., concurred.